**UNITED STATES of America, Plaintiff,**

v.

**Zaher ZAHREY, Lyndell Ingram, Eric Sandoval, and Javier Mercado, Defendants.**

**No. 96 CR 0910(NG)(JMA).**

United States District Court,
E.D. New York.

April 29, 1997.

Zachary Carter, United States Attorney, E.D. of N.Y., by Martin E. Coffey, Assistant United States Attorney, Brooklyn, NY, for U.S.

Joel B. Rudin, New York City, for Zaher Zahrey.

Frank T. Geoly, Brooklyn, NY, for Lyndell Ingram.

Alan M. Nelson, Lake Success, NY, for Eric Sandoval.

Donald D. duBoulay, New York City, for Javier Mercado.

---

### ORDER

GERSHON, District Judge:

Defendants' pre-trial motions to suppress certain statements were referred to the Honorable Joan M. Azrack, Magistrate Judge, for report and recommendation. Defendants Zahrey, Sandoval and Mercado have filed objections to Judge Azrack's report, dated April 1, 1996, which recommended denial of all motions. Review under 28 U.S.C. § 636(b)(1)(B) is *de novo. See United States v. Rosa,* 11 F.3d 315, 328 (2d Cir.1995).

I now adopt Judge Azrack's factual findings and legal conclusions. Her reports sets forth the facts with admirable clarity, and it comprehensively, and accurately, applies the applicable law to the facts. The motions to suppress are denied for the reasons set forth in the report, which is appended.

Finally, defendant Mercado now argues that evidence regarding his physical responses to a question, even if not suppressed, should be excluded under Rule 403 of the Federal Rules of Evidence. That application

is denied. The evidence is not unfairly prejudicial within the meaning of Rule 403.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

AZRACK, United States Magistrate Judge:

Defendants' pre-trial motions to suppress certain statements were referred to the undersigned for report and recommendation. I presided over hearings in this matter on December 13 and 18, 1996 and on February 5, 1997. Because the factual background of each defendant's disputed statements differs, this Report and Recommendation will address each defendant's motion separately.

### DISCUSSION

#### 1. *Burden and Standard of Proof*

The Government bears the burden of establishing the voluntariness of defendants' statements by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 169, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *U.S. v. Diaz,* 891 F.2d 1057, 1060 (2d Cir.1989) (citing *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)); *U.S. v. Burger,* 739 F.2d 805, 809 (2d Cir. 1984) (government bears burden of proving voluntariness of confession and waiver of right to remain silent); *U.S. v. Mastrangelo,* 693 F.2d 269, 273 (2d Cir.1982) (government bears burden of proof of waiver by a preponderance); *United States v. Hackley,* 636 F.2d 493, 500 (D.C.Cir.1980) (waiver of the right to remain silent must be established by preponderance of the evidence). Thus, with respect to each defendant, the Government bears the burden of proving that the statements should not be suppressed.

#### 2. *Defendant Zaher Zahrey*

According to New York City Police Lieutenant Robert Boyce, the Internal Affairs Bureau (IAB) opened an investigation of former police detective Zaher Zahrey on March 23, 1994. (Tr. 9.)[1] The investigation stemmed from information that Zahrey was

---

1. "Tr." refers to the transcript of the suppression hearing held on December 13, 1996 and December ber 18, 1996.

involved with a robbery gang whose members included the other defendants in this case. (Tr. 9–10.) On August 10, 1995, IAB officers were instructed to follow Zahrey and stop him in order to perform a procedure known as a "modification," whereby the subject officer's gun, shield and identification card are removed and the officer is placed on modified assignment. (Tr. 14.) When a police officer is modified, he remains a member of the police department but is removed from active duty. (Tr. 14–15.) Boyce testified that modifications are, at times, performed in the field, rather than by calling the subject officer into the precinct, out of concern for the safety of the officer and the public. The fear of the Police Department is that after learning that he is to be modified, the officer will harm himself or others with his gun. (Tr. 15–16.) In the case of defendant Zahrey, Captain Welsome made the decision that Zahrey was to be approached in the field to commence modification. (Tr. 17.)

Thus, on August 10, 1995, acting under Captain Welsome's directive, Lieutenant Carley, Sergeant Vasquez and Captain Welsome observed defendant Zahrey waiting inside a bank. (Tr. 202.) Lieutenant Carley approached Zahrey in the bank and ordered him to accompany Carley outside to see the Internal Affairs Captain. (Tr. 202–03, 222.) Sergeant Vasquez testified that Lieutenant Carley was not physically holding or touching Zahrey as they entered the lobby. (Tr. 222.) In the lobby, Captain Welsome informed Zahrey that he was being placed on modified assignment. (Tr. 203.) According to Welsome, Zahrey asked, "Is this about the deli?" and Welsome responded that Zahrey was to be modified in the best interests of the Department. (Tr. 205–06.) Welsome testified that Zahrey expressed embarrassment at having a confrontation in public and asked to go across the street to the 81st Precinct. (Tr. 203.) After obtaining permission to use the Administrative Lieutenant's office in that Precinct house, Officers Carley, Vasquez, Welsome, and defendant Zahrey went into the office to begin the modification. (Tr.

203–204.) Welsome then left the office to speak with the commanding officer of the Precinct. (Tr. 209.) During his absence, the other officers informed Zahrey that they were required to take his guns. (Tr. 209–210, 224–25.) It is undisputed that Zahrey was required to turn in his weapons and that he would face suspension if he did not comply. (Tr. 65–67.) In the conversation that ensued, Zahrey advised the officers that one of his guns was not in his possession, and would have to be retrieved from his brother-in-law. (Tr. 209–210, 224–25.)

Shortly after the modification began, Lieutenant Boyce arrived at the 81st Precinct and entered the Administrative Lieutenant's office. (Tr. 22, 210, 225.) According to Boyce, when Zahrey saw him enter the room, Zahrey said, "Oh, this is about Supreme, this is why you are here." (Tr. 23.) It was apparent to Boyce that Zahrey recognized him from two encounters that took place shortly after the murder of William "Supreme" Rivera.[2] (Tr. 22–23, 53–57.) Boyce testified that he may have said, "good morning" before Zahrey made the statement about Supreme, but that he had not asked Zahrey any questions prior to the statement. (Tr. 23.) Boyce stated that Zahrey was seated at the time that he made the statement and that he was not handcuffed or restrained in any way. (Tr. 24.) Boyce testified that he responded to Zahrey that he "would not tell him the nature of the investigation, only of its serious gravity and it was a criminal investigation and that he was being placed on modified assignment." (Tr. 24.) According to Boyce, Zahrey then became physically agitated and said "something to the effect that they are lying about me, they are all out to get me because I'm a cop." (Tr. 24.)

Captain Welsome testified that upon his return to the office, Zahrey asked a number of questions about the nature of the modification. (Tr. 211.) Specifically, Welsome stated that Zahrey said that "he was a hard-working individual, he hadn't done anything wrong. He wanted to know why we were

---

**2.** According to the Government, William Rivera was a criminal associate of the defendants and was involved in the armored car robbery that took place on March 20, 1992. Rivera was murdered on March 10, 1994 (Tr. 2, 9, 53.) ("Tr. 2" refers to the transcript of the probable cause hearing that I presided over on February 5, 1997.)

there, what was this all about . . . " (Tr. 211.) Welsome stated that after Boyce arrived, Zahrey "was much more animated and he was talking about people lying about him, and that there were people who hated him and he felt he was being—the reason I recall this is because he directed it at me—that I was modifying him based on the work of some mutts." (Tr. 214.) Captain Welsome did not recall hearing Zahrey mention the name Supreme. (Tr. 214, 216.) Welsome stated that he later learned of the comment about Supreme when Boyce made reference to the comment and asked Welsome, "Weren't you there when he said that?" (Tr. 215.)

According to Boyce, after Zahrey made the statements, the conversation returned to the subject of retrieval of Zahrey's weapons. (Tr. 25.) Upon entering the office, Boyce learned that Zahrey had already surrendered at least one gun, (Tr. 67, 69), but that one of Zahrey's guns was unaccounted for. (Tr. 68.) Defendant Zahrey then made a series of phone calls in an effort to locate the gun. (Tr. 69–72.) Then, after asking more questions about the nature of his modification, (Tr. 25), defendant Zahrey stated that he would not say more without an attorney present. (Tr. 27, 78.) Boyce credibly testified that the conversation stopped at that point, (Tr. 28), and Boyce informed Zahrey that he must accompany Boyce to Zahrey's brother-in-law's house, where the unaccounted for gun was presumed to be. (Tr. 81.) It is undisputed that Zahrey faced suspension if he refused to accompany Boyce to retrieve the gun. (Tr. 81, 82.) The two men agreed to go in Zahrey's car. (Tr. 82.) Boyce testified that the car ride took approximately one hour, (Tr. 29, 84), and that during that time they conversed about a variety of subjects, including Zahrey's "Arab descent," his arranged marriage, and his job history with the Police Department. (Tr. 85.) Zahrey told Boyce during the conversation that he had previously worked undercover on the Brooklyn North Narcotics Division and that he

currently was working at the field operations desk where he was responsible for taking notifications about alleged criminal activity. (Tr. 86.) In addition, Zahrey asked Boyce, "What did that [or this] nigger Lenny say about me?" (Tr. 29, 88),[3] and "Did that prick Guggi say anything about me?" (Tr. 29, 90.) According to Boyce, "Lenny" referred to Zahrey's co-defendant Lyndell Ingram, (Tr. 31–32), and "Guggi" referred to Alex Vasquez, who also was known to the investigating officers and had been involved in the murder of William Rivera. (Tr. 119, 120.) Boyce testified that he did not ask Zahrey any questions during the car ride, but that Zahrey made statements upon his own initiative. (Tr. 29–30.) According to Boyce, each time Zahrey made a statement, Boyce reiterated that he could not comment on the investigation. (Tr. 30.)

Lieutenant Boyce did not indicate in his written report of the events that took place on that day that Zahrey made the statements about Lenny and Guggi during the car ride, even though he did record Zahrey's statement about Supreme. (Tr. 60, 62–63, 218–220.) In fact, no police officer's notes concerning that day indicate that Zahrey made the statements about Lenny and Guggi. (Tr. 42.) Nevertheless, I found Boyce to be a credible witness, and I believe his testimony that Zahrey in fact made the statements.

It is undisputed that Zahrey was not given his *Miranda* warnings at any time during the modification process at the 81st precinct. (Tr. 77.) Zahrey argues that this was a "forced" encounter, that he was therefore in custody and that given the absence of the *Miranda* warnings, the statements should be suppressed.

The first issue, therefore, with regard to defendant Zahrey, is whether he was in custody when he made the statements. If he was, the *Miranda* warnings were required and the statements should be suppressed. If Zahrey was not in custody, the *Miranda* warnings were not required and the state-

---

**3.** The Government has agreed to redact this reference to co-defendant Ingram on the basis that is inadmissable under *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622–23, 20 L.Ed.2d 476 (1968). (Gov't Mem. at 5.) If defendant Zahrey testifies at trial, however, the Gov-

ernment will seek to cross-examine him about the statement. Because defendant Ingram would then also have the opportunity to cross-examine Zahrey, the statement would no longer be protected by *Bruton. See Bruton,* 391 U.S. at 136–37, 88 S.Ct. at 1628–29.

ments need not be suppressed. Second, the Government argues that Zahrey was not being interrogated during the modification and that, therefore, the *Miranda* warnings were not required. If Zahrey was interrogated in a custodial setting, the statements should be suppressed. If Zahrey was not interrogated, the statements should not be suppressed, even if the setting was custodial. Third, Zahrey argues that he made statements in the car after requesting counsel and that those statements therefore should be suppressed. And finally, defendant Zahrey has raised another issue in his post-hearing brief: did Zahrey's status as a government employee, and the fact that there would be employment related consequences if he had refused to comply with the modification process, cause his statements to be coerced. If his statements were coerced, they must be suppressed. If not, the statements need not be suppressed.[4]

### a. *Was Defendant Zahrey in custody when he made the statements?*

■ *Miranda* warnings are required only when law enforcement agents interrogate a person who is in custody. *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.1995). To determine custody, the court must employ an objective standard, *Stansbury v. California,* 511 U.S. 318, 322–24, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994), and find that a reasonable person in the defendant's position would have understood himself to be subject-

ed to restraints comparable to those associated with a formal arrest. *U.S. v. Ali,* 68 F.3d 1468, 1472 (2d Cir.1995) (citing *United States v. Mussaleen,* 35 F.3d 692, 697 (2d Cir.1994) (quoting *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir.1992) (in turn quoting *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984))); *Campaneria v. Reid,* 891 F.2d 1014, 1021 n. 1 (2d Cir.1989)). The law is clear that the court must examine the totality of the circumstances when making that inquiry. *U.S. v. Ruggles,* 70 F.3d 262, 264–65 (2d Cir.1995). As such, the court may consider the person's background, experience, familiarity with police questioning and *Miranda* rights, age, maturity, education, and intelligence. *Id.*

When the circumstances under which defendant Zahrey made statements are viewed in their totality, the Government easily has met its burden of proving that a reasonable person in Zahrey's position would not have understood himself to be subject to the restraints associated with formal arrest. First, I take into account Zahrey's familiarity with police questioning and *Miranda* rights. *Ruggles,* 70 F.3d at 265. In *Ruggles,* the Second Circuit held that the defendant was not in custody when he conferred with law enforcement agents, noting that the defendant was familiar with police questioning and the *Miranda* rights, given his extensive criminal history. *Id.* at 265. In this case, defendant Zahrey undoubtedly was familiar with

---

4. In submissions to this Court, defendant Zahrey has repeatedly asked for the suppression hearing to be reopened to determine whether the "period of custody," as he refers to the modification, was supported by probable cause. I have declined to reopen the hearing for this purpose because, as is discussed at length, *infra* at 1278–1282, the modification was not custodial. Because the modification was not custodial, it was not a seizure under the Fourth Amendment, *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."), and, therefore, probable cause was not required. *Dunaway v. New York,* 442 U.S. 200, 202, 99 S.Ct. 2248, 2251, 60 L.Ed.2d 824 (1979); *United States v. Hooper,* 935 F.2d 484, 494 (2d Cir.), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

Also, I note that counsel's continual requests to reopen the hearing on the probable cause issue have been in vain, even though this Court had not yet rendered a decision on the custody issue when the requests were made. To wit, if the Court rules that the modification was not custodial, the police were not required to establish probable cause and, therefore, no probable cause inquiry is necessary; in the alternative, if the Court rules that the modification *was* custodial, the statements must be suppressed, since they were obtained without advice of *Miranda* rights. In the latter event, no probable cause inquiry would be necessary to suppress Zahrey's statements, since they already would be suppressed as having been obtained in violation of the Fifth Amendment right against self-incrimination. A probably cause hearing and determination would superfluous; thus, Zahrey's requests for a probable cause hearing have been groundless.

police questioning and was aware of the *Miranda* rights, having gained that knowledge from his eleven years of employment on the police force. *See United States v. Charles,* 738 F.2d 686, 694 (5th Cir.1984) (fact that defendants were working as police officers when they made statements was a factor in finding that they were not in custody). Presumably, Zahrey also knew of the procedures associated with a modification of police duties and was cognizant of the difference between a modification and an arrest. (Tr. 112–13.) *See Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 866 (2d Cir.1992).

The scenario described by the Government's witnesses also is stunningly free of other indicia of an arrest. For example, there is no evidence that the police officers who performed Zahrey's modification threatened that he would be arrested if he refused to cooperate. *See United States v. Guarno,* 819 F.2d 28, 32 (2d Cir.1987) (threat of arrest for refusal to cooperate suggests custody). Rather, they testified, there merely would have been administrative, or job related, consequences such as suspension if he refused to cooperate. (Tr. 65–67, 81–82.) Presumably Zahrey was aware of those consequences given his tenure on the force. (Tr. 112–13.) *See Sorlucco,* 971 F.2d at 866 (" '[M]odified assignment' is commonly understood by rank and file police officers to be a stigmatizing disciplinary status.")

Further, although the police officers did not inform Zahrey that he was free to leave, *see Guarno,* 819 F.2d at 32 (statements that person is free to leave are indicia of lack of custody), they also did not tell him that he was not allowed to leave. (Tr. 22–32, 208–209.) *United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.1990) (fact that agent did not tell suspect that he was not free to leave is a factor weighing against a finding of custody). The officers also did not specifically inform Zahrey that he was a suspect of a criminal investigation. (Tr. 24, 205–06.) *Stansbury v. California,* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue . . . . "). Instead, they refused to tell him

of the details underlying the modification and informed him that it was "serious and criminal in nature." (Tr. 24.) That alone, is insufficient to indicate custody because the situation is not necessarily custodial because the officers' subjective beliefs about the person and whether he is a suspect are inconsequential in the custody inquiry, even where the person is a suspect or the focus of an investigation. *Stansbury,* 511 U.S. at 322–26, 114 S.Ct. at 1529–30. The IAB officers' views or beliefs about defendant Zahrey's involvement with the robbery gang were not disclosed to Zahrey during the modification and therefore have no impact on whether the situation was custodial.

Zahrey also was not handcuffed at any time during the modification. (Tr. 24.) *United States v. Averell,* 296 F.Supp. 1004, 1019 (E.D.N.Y.1969) (use of handcuffs is indicative of custody). Furthermore, there also was no evidence that Zahrey was to be held for any longer than it took to retrieve his weapons. (Tr. 113–14.) In fact, if the last weapon had not been in possession of Zahrey's brother-in-law, the modification would have ended sooner than it did. (Tr. 113–14.) *See Berkemer v. McCarty,* 468 U.S. 420, 437–38, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984) (a presumptively temporary and brief holding by the police is likely not to be custodial, in contrast with a prolonged interrogation where the "detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.")

In addition, the fact that the modification took place at a police station is insufficient to render it custodial. *United States v. Charles,* 738 F.2d 686, 693 (5th Cir.1984) (citing *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)) ("the requirement of giving *Miranda* warnings is not to be imposed simply because police question a suspect in the police station"); *see also People v. Berry,* —— A.D.2d ——, 652 N.Y.S.2d 785, 787 (1997) (interview was not custodial where defendant was questioned at her place of work which happened to be a correctional facility because "[t]he fact that defendant happens to have worked in a correctional facility is completely

fortuitous and does not transform th[e] interview into something sinister.... "). Zahrey cites *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), for the proposition that "bringing suspect to station house for questioning is tantamount to an arrest." (Def. Zahrey's Post–Hearing Memo at 9.) The issue in *Dunaway,* however, was whether the police had violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took the defendant into custody, transported him to the police station, and detained him there for interrogation. The Supreme Court's ruling turned on its interpretation of the word "seizure" as used in the Fourth Amendment and its application to the arrest in that case. *Dunaway,* 442 U.S. at 206–07, 212–13, 99 S.Ct. at 2253–54, 2256–57; *see also United States v. Ali,* 68 F.3d 1468, 1473 (2d Cir. 1995), *on reh'g on other ground,* 86 F.3d 275 (2d Cir.1996). In addition, the Court's decision that the arrest was a Fourth Amendment seizure was based on several factors, not only that the interrogation occurred at a police station. *Dunaway,* 442 U.S. at 212–13, 99 S.Ct. at 2256–57.

And even if a police station is not the least restrictive environment in which a modification can take place, the officers also testified that the modification *began* in public, at the bank, rather than within the confines of a police station. (Tr. 202–03.) *McCarty,* 468 U.S. at 438, 104 S.Ct. at 3149 ("[E]xposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [subject]'s fear that, if he does not cooperate, he will be subjected to abuse" and thereby is substantially less "police dominated" than detentions where has *Miranda* has been required.) It was *Zahrey* who suggested that the officers go into the 81st Precinct, rather than perform the modification on the street. (Tr. 203.) The officers deferred to Zahrey's wishes and obtained a room in the precinct house where the modification was held. Thus, although Zahrey's superiors directed that the modification process take place at that time, they were not restricting his freedom of movement or action such that he should reasonably have believed himself to be in custody.

*See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

Moreover, it would be error to place too much significance on the fact that the modification took place within a police station; after all, a modification is an administrative police matter related to employment. It is, therefore, likely that modifications take place at police stations on a regular basis. To characterize all such modifications as custodial encounters surely would overreach the parameters of *Miranda,* particularly since officers may be modified for reasons other than an underlying criminal investigation. *See Sorlucco,* 971 F.2d at 866 (officer may be placed on modified assignment for various criminal infractions, violations of departmental regulations, and whenever the circumstances indicate that such action would be in the best interest of the department).

In sum, the Government has established by a preponderance of the evidence that defendant Zahrey's encounter with the police at the 81st Precinct as they performed the modification procedure was not custodial. Accordingly, the *Miranda* warnings were not required.

■ Certain of Zahrey's statements were made during the car ride with Lieutenant Boyce immediately following the encounter at the 81st Precinct. (Tr. 29, 88, 90.) It is undisputed that the only reason that car ride was necessary was that Zahrey was not in possession of all the guns that he was required to turn in to his supervisors. (Tr. 113–14.) Without the need to retrieve the last gun from Zahrey's brother-in-law, the modification presumably would have concluded at the 81st Precinct. (Tr. 113.) Thus, the car ride must be considered part of the modification procedure.

Boyce testified that during the ride to retrieve the gun, the conversation between the two men was superficial. (Tr. 85.) It ranged in topics from Zahrey's history with the Police Department to his marriage. (Tr. 85–86.) Throughout the conversation, Zahrey asked several times why his status as an officer had been modified. (Tr. 29, 88, 90.) Boyce responded, as he had in the 81st Pre-

cinct, that he could not talk about the underlying nature of the modification and that it was criminal in nature. (Tr. 88.). Such comments were not evocative or threatening. *Rhode Island v. Innis,* 446 U.S. 291, 303, 100 S.Ct. 1682, 1690–91, 64 L.Ed.2d 297 (1980). Also, the ride was not of significant duration. (Tr. 79, 84.) *McCarty,* 468 U.S. at 437–38, 104 S.Ct. at 3148–49. Although Zahrey was required to accompany Boyce to retrieve the gun as part of the modification, he was permitted to exercise his preference to travel in his own car with Boyce. (Tr. 82, 113, 122, 203.) In fact, Boyce permitted Zahrey to drive the car. (Tr. 40.) *Cf. United States v. Ceballos,* 812 F.2d 42, 45 (2d Cir.1987) (setting was custodial where law enforcement agents refused to allow defendants to follow them in his company car).[5] In addition, Boyce did not threaten that Zahrey would be arrested if he failed to cooperate. (Tr. 22–32.) *Guarno,* 819 F.2d at 32 (threat of arrest indicates custody).

In sum, the car ride was part of the modification procedure that began at the bank and continued at the police precinct and no intervening event during the car ride changed the character of the episode to render it custodial. The Government, therefore, has met its burden by a preponderance of the evidence to show that the car ride was not custodial and that *Miranda* warnings were not required.

b. *Was Zahrey interrogated during the modification?*

■ *Miranda* protections are not invoked unless a person who is in custody is interrogated by law enforcement agents. " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). As a result, not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Id.* at 299, 100 S.Ct. at 1689. The Supreme Court has ruled that the *Miranda* safeguards come into effect "whenever a person in custody is subjected to either express questioning or its functional equivalent," *id.* at 300–01, 100 S.Ct. at 1689, and has defined "functional equivalent" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. A court's inquiry into whether a suspect was interrogated should focus on "the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. at 1690.

It is undisputed that the IAB officers did not engage in express questioning of Zahrey during the modification, other than to ask the location of his weapons. (Tr. 23, 29, 30, 69.) And nothing indicates that any of the officers should have known that "their conversation was reasonably likely to elicit an incriminating response from [Zahrey]." *Id.* at 302, 100 S.Ct. at 1690. The officers credibly testified that at the 81st Precinct, rather than speaking of the Police Department's underlying suspicions or investigation relating to defendant Zahrey, they addressed their concerns only to the mechanics of the modification procedure. (Tr. 23, 29, 30, 69, 204–05.) Their primary interest was retrieving Zahrey's guns, and in fact when Zahrey asked or

---

5. Defendant Zahrey likens this case to *United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987). In *Ceballos,* the Second Circuit held that defendant Adames, who was suspected of involvement in a counterfeiting operation, was held in investigative custody by Secret Service agents who refused to allow Adames to follow them in his company car. The agents conveyed that the situation was urgent and that Adames was required to accompany them for questioning. *Ceballos,* however, differed in a critical way from Zahrey's scenario, which must be assessed based on the *totality* of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870,

1878–79, 64 L.Ed.2d 497 (1980). The law enforcement agents in *Ceballos* had only one reason to deal with the defendant Adames: the fact that he and his boss were suspected of running a counterfeiting operation. Zahrey, on the other hand, *was* a law enforcement agent; his supervisors had to confront him as a matter of his employment, rather than as part of a criminal investigation. Thus, as a police officer, Zahrey would not reasonably have been taken aback or intimidated by police presence, or by the "urgency" of a commanding officer's order. In this way, *Ceballos* establishes no precedential effect in this case.

made comments about the reasons behind his modification, the officers advised him not to speak and told him that they would not speak of the investigation, except to say that it was serious and criminal in nature. (Tr. 76, 77, 78, 206, 211–12.) In my view, the officers made a deliberate effort to avoid speaking about the investigation, which was still ongoing at that time. (Tr. 32, 87, 89, 206, 211–12.) Unlike in *Innis,* the police did not carry on a "lengthy harangue in the presence of the suspect." *Id.* at 303, 100 S.Ct. at 1691. Nor were the officers' comments "particularly 'evocative.'" *Id.*

The same is true of the car ride from the 81st Precinct to the Cropsey Avenue address where defendant Zahrey's remaining gun was retrieved. Officer Boyce did not ask express questions of Zahrey. (Tr. 89–90, 115.) The conversation that took place in the car was at Zahrey's own initiative, and included mundane topics such as Zahrey's ethnic descent and his marriage. (Tr. 85.) When Zahrey did ask Boyce about the reason for his modification or made statements about other parties who ultimately were involved in this case, Boyce responded that he could not discuss the investigation. (Tr. 29–30.)

Moreover, contrary to defendant's assertion, there is nothing in the record to suggest that the officers made an appeal to which Zahrey was "peculiarly susceptible." *Innis,* 446 U.S. at 302, 100 S.Ct. at 1690. It would be ludicrous to conclude that performance of the modification, coupled with the IAB officers' reticence with regard to the underlying investigation was an appeal for cooperation that was "reasonably likely to elicit an incriminating response."*Id.* at 303, 100 S.Ct. at 1691. During the modification the officers did not make even a subtle appeal to Zahrey to cooperate; rather, they avoided reference to the criminal investigation altogether. In addition, the officers' decision to perform the modification in the field, rather than to call Zahrey to the precinct, was due to their concern that he might harm himself or others when he learned he was to be modified. (Tr. 15–16.) That concern does not, as is suggested by the defense, establish a presumption that Zahrey was in a weakened mental

state that was likely to cause him to make incriminating statements when he was faced only with the mechanics of the modification procedure.

Thus, the Government has established by a preponderance of the evidence that Zahrey's statements were not the "product of words or actions on the part of the police that they should have known were reasonably likely to elicit and incriminating response." *Innis,* 446 U.S. at 303, 100 S.Ct. at 1691. As a result, even if the setting were custodial, *Miranda* warnings were not required because no interrogation, or its functional equivalent, took place.

c. *Were the statements coerced as a result of his being a government employee?*

■ Defendant Zahrey also argues that his statements were coerced and that their admission would violate his constitutional privilege against self incrimination. Zahrey bases this argument on *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity,* a group of municipal police officers were investigated by the New Jersey Attorney General, pursuant to an order of the New Jersey Supreme Court, concerning an allegation of fixing traffic tickets. Before being questioned by the Attorney General's office, each suspect officer was given the following warning:

(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office.

*Garrity,* 385 U.S. at 494, 87 S.Ct. at 617. The officers answered questions, no immunity was granted, some of their answers were used (over their objections) in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws, and the officers were convicted. *Id.* at 495, 87 S.Ct. at 617–18. The convictions were affirmed and the United States Supreme Court granted certiorari on the question of whether the officers' statement were coerced and therefore inadmissible.

The Court held that because the officers were given the choice between self-incrimination and job forfeiture, pressure was exerted on the officers so " 'as to disable [them] from making a free and rational choice.' " *Id.* at 497, 87 S.Ct. at 618 (citing *Miranda v. State of Arizona,* 384 U.S. 436, 464–65, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694 (1966)). "The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id.* As such, the Court ruled that "the statements were infected by the coercion inherent in this scheme of questioning and [could not] be sustained as voluntary. . . ." *Id.* at 497–98, 87 S.Ct. at 618–19. In sum, the Court stated, "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500, 87 S.Ct. at 620.

*Garrity,* however, offers no refuge for defendant Zahrey. Zahrey simply was not given a choice between his continued employment by the Police Department and self-incrimination. Zahrey was subjected only to a departmental procedure, known as modification, whereby his badge and guns were removed and he was placed on modified assignment. (Tr. 14.) It is true that Zahrey would have faced suspension if he had not cooperated with the modification. (Tr. 66.) But the choice he was given was to surrender his guns and badge or be suspended; he was not asked, either expressly or implicitly, about his alleged involvement with any criminal activity. (Tr. 21–33 *passim;* 67–92 *passim.*) As a result, it is impossible to conclude that Zahrey's statements were elicited by police using pressure that "disable[d] him from making a free and rational choice." *Garrity,* 385 U.S. at 497, 87 S.Ct. at 618. Zahrey's statements, therefore, were not coerced and were voluntary.

d. *Should Zahrey's later statements be suppressed because they were made after he requested counsel?*

■ Defendant Zahrey also argues that the statements he made during the car ride with Lieutenant Boyce should be suppressed because they were made after Zahrey had requested counsel. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630–31, 16 L.Ed.2d 694 (1966) held that "the Fifth and Fourteenth Amendments' prohibition against self-incrimination require[s] that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona,* 451 U.S. 477, 481–82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (citing *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630–31). When a suspect has invoked his Fifth Amendment right to counsel, however, he may subsequently waive that right if "he himself initiates further communication, exchanges, or conversations with police." *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885.

As a threshold matter, however, because Zahrey was not subjected to custodial interrogation, *see supra* at 1278–1282, he did not yet have a right of counsel to invoke. *Edwards,* 451 U.S. at 485–86, 101 S.Ct. at 1885 ("The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any *custodial interrogation.* Absent such interrogation, there would have been no infringement of the right that [defendant] invoked and there would be no occasion to determine whether there had been a valid waiver." (emphasis added)). As a result, it is inconsequential that the statements were made after Zahrey expressed his desire to speak with an attorney, (Tr. 27, 78), and therefore, the statements were not obtained in violation of the Fifth and Fourteenth Amendments.

In sum, the Government has proven by a preponderance of the evidence, that (1) defendant Zahrey was not subjected to custodial interrogation which would require *Miranda* warnings, (2) Zahrey's statements were not coerced under the threat of loss of employment, and (3) Zahrey was not entitled to invoke the right to counsel because the modification was not custodial. As a result, it is respectfully recommended that defendant Zahrey's motion to suppress his statements be denied.

### 3. *Defendant Javier Mercado*

Defendant Mercado's statements arose during two encounters with the police. The first took place on August 17, 1995 when police met with Mercado to determine whether he was indeed a suspect in an armored car robbery that took place on March 20, 1992 and the second was when he was arrested on January 19, 1996 for his participation in that robbery.

Sergeants Wirth and Boyce testified to the information they had about Mercado's alleged participation in the armored car robbery. They described that at approximately 8:00 a.m. on March 20, 1992, an armored car robbery had occurred in which one guard was killed and another was injured. (Tr. 2, 4.) Witnesses had informed the police that there had been three to four participants, wearing ski masks, (Tr. 2, 3), and that on that morning three stolen cars were parked in front of 117 57th Street, a check cashing establishment. (Tr. 2, 4.) When the armored car arrived, it had to pull ahead of two of the stolen cars which were directly in front of the check cashing store. (Tr. 2, 4.) Two guards exited the truck and one of them approached the check cashing store. A shooting then occurred in the doorway of the location. (Tr. 2, 4.) The investigation revealed that the guards had been shot with a shotgun and that $186,000 in denominations of fifties, twenties and tens were stolen. (Tr. 2, 4, 5.) Approximately two to three blocks from the robbery scene, a blue station wagon that had been reported stolen a week earlier was found. (Tr. 2, 5.) According to witnesses, that car had been the getaway car. (Tr. 2, 5.) Inside the car, the police found a black ski mask and a nine millimeter automatic handgun.

During the spring of 1995, the police received information about the robbery from an cooperating informant, Sidney Quick, who was incarcerated at Ossining Correctional Facility. (Tr. 2 at 6, 20, 30.) Quick was interviewed by the police a number of times. (Tr. 2 at 20.) Sergeant Wirth first interviewed Quick in June, 1995, accompanied by Lieutenant Calabro, Sergeant McGee, and Lieutenant Boyce. (Tr. 2 at 20, 23.) According to Wirth, Quick stated that William "Supreme" Rivera had told him that "Lenny," "Big E," "Javi," and Rivera had participated in the March, 1992 armored car robbery. (Tr. 2 at 7, 9, 21, 22, 24, 26, 27.) (Quick referred to the robbery participants only by nickname. (Tr. 2, 27.)) According to Quick, Rivera told him that Lenny and Rivera had a confrontation with the armored car guard and that Lenny had shot one guard. Quick also related Rivera's statement that Javi and Big E were in the street standing by. (Tr. 2, 9, 22.) Quick also told police that shortly after the robbery Lenny, Supreme, Big E, and Javi went to Florida and that in Florida Javi had been arrested. (Tr. 2, 22.)

In an effort to identify the people Quick had referred to, the police looked at the funeral guest book of William Rivera and found the names of defendants Eric Sandoval, Javier Mercado, and Zaher Zahrey. (Tr. 2, 8.) Defendant Lyndell Ingram's name was found in police reports. (Tr. 2, 10.)

Lieutenant Boyce testified that he made a further effort to identify the "Javi" referred to by Quick. (Tr. 33, 94.) Toward that end when Boyce found the name Javier Mercado in a homicide folder from the 72nd Precinct, he decided to seek out Mercado to determine whether he was the Javi involved in the robberies. (Tr. 33, 101.) Thus, on August 17, 1995, Lieutenant Boyce went to Javier Mercado's apartment and spoke with his girlfriend, Gabrielle Brinka, who brought Boyce to a nearby basketball court where Mercado was playing. (Tr. 34.) Brinka called over to Mercado when they arrived at the court, and Mercado approached her, Lieutenant Boyce and Sergeant Magee. (Tr. 34.) Boyce admitted that at that time, he was trying to determine whether Mercado should be a target of the investigation, (Tr. 93), but that he did not inform Mercado that he was being investigated. (Tr. 95, 101, 102.) Nor did Boyce advise Mercado of his *Miranda* rights. (Tr. 36.) According to Boyce, he asked defendant Mercado "if he would like to come to the 72nd Precinct, we'd like to talk to him about a few things," (Tr. 35, 97), and Mercado readily complied. (Tr. 35, 97.) Boyce credibly denied that he threatened Mercado that he would handcuff him if he did not agree to get into the car. (Tr. 97.) In

addition, Boyce testified that he told Mercado that he would drive him back after they were finished at the Precinct. (Tr. 128.) Boyce drove the IAB van with Mercado in the back seat and Magee in the front passenger seat. (Tr. 35.) Mercado was not handcuffed or arrested at that time. (Tr. 36.) During the car ride, Mercado asked why the officers wanted to question him and they responded that they wanted to "basically talk about some friends of [his]." (Tr. 100.)

When the officers and Mercado arrived at the precinct, they went to an interview room. (Tr. 36.) It is undisputed that the officers did not give Mercado the *Miranda* warnings in the interview room, (Tr. 36), nor did they inform Mercado that he was a target of an investigation. (Tr. 101, 102.) The officers asked Mercado about his associations with Lyndell Ingram, William Rivera, Eric Sandoval and Zaher Zahrey. (Tr. 36.) In response, Mercado stated that he had known Ingram for quite sometime, and that he also knew Rivera and Sandoval. (Tr. 36–37.) When asked whether he had left New York in 1992, Mercado answered that he had traveled by plane to Florida with Rivera, Sandoval, Ingram and Zahrey.[6] (Tr. 38, 39.) At the hearing, Boyce explained that the trip to Florida was shortly after the armored car robbery that the gang was alleged to have perpetrated in 1992. (Tr. 38.) Mercado also stated that he had been arrested while in Florida for possession of marijuana. (Tr. 39.) He stated that "he knew Zahrey was a cop but Zahrey would often ask people not to say anything because he didn't want people knowing he was a cop." (Tr. 39.) Boyce testified that he also asked Mercado whether he knew about or had any knowledge of the March 20, 1992 armored car robbery. Mercado denied any such knowledge and his demeanor then became visibly nervous. Boyce described him as perspiring heavily and that his voice "was in a halting manner." (Tr. 39, 40, 104, 105.) The officers also asked Mercado if he had bought a car in that year and he answered affirmatively. (Tr. 40.) Boyce stated to Mercado that the car was a Lincoln Continental and "he said yes, it was,

but it needed work when he bought it." (Tr. 40.) Boyce also asked Mercado whether he had participated in the armored car robbery and Mercado responded no. (Tr. 40.) Boyce asked Mercado if he would take a polygraph test and initially he agreed. (Tr. 40.) Then Mercado said that he was too tired that evening and did not want to take the test. (Tr. 41.) Mercado indicated that he wanted to go home and shower, the officers said "yes," but Mercado did not leave. (Tr. 105, 128.) The conversation then moved away from the polygraph issue. (Tr. 105.) The interview was then concluded and Boyce drove Mercado back to his residence. (Tr. 117.)

The entire duration of the questioning at the 72nd Precinct was two and a half hours. (Tr. 98.) Boyce testified that Mercado was not handcuffed at any time during the interview, (Tr. 99), and that if he had wanted something to drink, he would have been accommodated. (Tr. 99.) He also stated that the officers told Mercado several times that he could leave when he expressed a desire to do so near the end of the interview, (Tr. 103, 128–29), although the officers did not immediately offer to take him home. (Tr. 129.)

Sergeant Wirth testified that the investigation into the armored car robbery continued and in September 1995 he interviewed Maria Montenez, William Rivera's mother. (Tr. 2, 17, 18.) Ms. Montenez told the police that a day or two after the robbery, William Rivera, Lyndell Ingram, Eric Sandoval, Javier Mercado and Zaher Zahrey were in her apartment, (Tr. 2, 18), and that the men were laughing and giggling and that a sum of currency was on the table. (Tr. 2, 19.)

Several months later, in December of 1995, the police interviewed Lisa Rivera, the sister of William Rivera. (Tr. 2, 10, 11.) Ms. Rivera admitted to the police her criminal history and her use of narcotics. (Tr. 2, 11.) Ms. Rivera informed the police that at least part of the planning of the March 1992 robbery took place in her apartment and that the participants were her brother William

---

**6.** The Government has agreed to redact this reference to Sandoval, Ingram and Zahrey pursuant to the principle set forth in *Bruton v. United*

*States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). (Gov't Mem. at 5; *supra* note 3.)

Rivera, Lyndell Ingram, Eric Sandoval, and Javier Mercado. (Tr. 2, 11–12.) She said that over the course of seven to ten days prior to the robbery, the four participants had three to four meetings regarding their plans. (Tr. 2, 12.) Ms. Rivera used the defendants' full names in identifying them. (Tr. 2, 12.) She told police that Javier Mercado was an active participant and that he had received directions from her brother to be at 57th Street at around 8:00 on the morning of the robbery and that he was to page Rivera that day. (Tr. 2, 13, 35.) Ms. Rivera claimed that her brother also directed Mercado to drive the getaway car. (Tr. 2, 32–33, 34.) Ms. Rivera also told police that on the morning of the robbery, her brother and Ingram were in her apartment wearing dark clothes, and that Ingram had a shotgun and Rivera had an automatic weapon. (Tr. 2, 13.) She stated that Sandoval picked them up in a white Camaro, and that Mercado beeped her brother while he was at the apartment. (Tr. 2, 13.) She told police that she overheard the conversation wherein Rivera told Mercado to meet them at the location. (Tr. 2, 13–14.)

According to Wirth, Lisa Rivera also told the police that later on the day of the robbery, she went with Ingram and her brother to her brother's apartment where they met up with Mercado and Sandoval. (Tr. 2, 16.) She said there William Rivera brought out a shoe box containing white envelopes and a quantity of cocaine. (Tr. 2, 16.) On the envelopes was written "Lenny, Javi, and Eric", respectively. (Tr. 2 at 16.) Another envelope was blank. (Tr. 2, 16.) According to Ms. Rivera, the men opened the envelopes which revealed a large quantity of money, which she described as fifties, twenties, tens, singles, and fives. (Tr. 2, 17.) Ms. Rivera stated to police that she saw Mercado take one envelope which contained currency, specifically fifties, twenties and tens. (Tr. 2, 17.)

Defendant Mercado's second police encounter occurred on January 19, 1996 when he was arrested without a warrant by the New York City Police for March 20, 1992 armored car robbery.

According to Sergeant Wirth, on January 19, 1996, Officers Amundson and Michaelson went to Mercado's apartment, and using a ruse that they were looking for a male black, they knocked on Mercado's apartment door. (Tr. 149–50.) When Mercado answered, they asked if there was a male black in the building; Mercado answered that there was, and the officers asked him to come outside to direct them to the man. (Tr. 150.) He was then placed under arrest. (Tr. 150.) The officers did not advise Mercado of his *Miranda* rights. (Tr. 36, 153.) Wirth conceded that Mercado was not immediately taken to Central Booking or to court to be processed for arraignment. (Tr. 151.) Rather, Mercado was handcuffed outside his apartment and transported to the Internal Affairs Bureau (LAB) in Queens. (Tr. 151.) During cross-examination, Wirth agreed that the IAB office is in an area of Queens where there are several warehouses, but stated that the actual office does not appear to be a forbidding atmosphere. (Tr. 152.)

Mercado was brought into a small office by Sergeants Winsper and Magee, where one of his hands was cuffed to a chair. (Tr. 136, 139.) When Sergeant Wirth arrived in that room, Sergeant Winsper informed him that Mercado had not been given his *Miranda* warnings, that he had not made any statements and that he had not requested an attorney. (Tr. 152.) Wirth took pedigree information from Mercado and informed him of his *Miranda* rights. (Tr. 136.) Wirth testified that he received a verbal affirmative response when he asked Mercado if he understood each respective right; Wirth did not write down Mercado's responses, nor did he have Mercado sign a written consent form. (Tr. 138–39, 156–57.) Wirth testified that the officers' weapons were not drawn during or after Mercado was informed of his rights. (Tr. 139.) Wirth then informed Mercado of the reason for his arrest, that is, the 1992 armored car robbery. (Tr. 136, 140, 155, 157.) Mercado denied participation in the robbery. (Tr. 140, 155.) Wirth then asked about Mercado's trip to Florida in March or April of 1992, and Mercado acknowledged that he had gone to Florida with

Ingram, Sandoval and Rivera.[7] (Tr. 140, 157.) He also acknowledged, when asked, that the four of them had bought cars in the same time period. (Tr. 140, 157–58.) Approximately one hour and forty-five minutes into the interview, Mercado requested an attorney. (Tr. 140.) According to Wirth, questioning then stopped and Mercado was processed for arrest, brought to Central Booking and sent to the New York City Correctional Facility. (Tr. 141.)

Defendant Mercado seeks to suppress the statements that he made on August 17, 1995, arguing that they were the product of a custodial interrogation without the benefit of *Miranda* warnings, in violation of his Fifth Amendment right against self-incrimination. Defendant also moves to suppress his January 19, 1996 statements on the grounds that they were the result of an arrest that was made without probable cause and an interrogation that constituted a purposeful delay in seeking an arraignment for him. Mercado also asks the court to exclude the officers' testimony regarding Mercado's physical response to certain questions, claiming that his response was not "testimonial" and therefore is inadmissible. Mercado finally asserts that the statements he made on both August 17, 1995 and January 19, 1996 constitute hearsay and are therefore inadmissible.

a. *Was Defendant Mercado in custody when he made the August 17, 1995 statements?*

■ Defendant Mercado claims that the interview he had with police on August 17, 1995 was custodial and that *Miranda* warnings were therefore required. Since *Miranda* warnings were not given, Mercado moves for suppression of the statements he made at that meeting.

As was discussed above with respect to defendant Zahrey, *Miranda* warnings are required only when law enforcement agents interrogate a person who is in custody. *Kirsh*, 54 F.3d at 1067. The court must employ an objective standard, *Stansbury*, 511 U.S. at 322–24, 114 S.Ct. at 1529, and must find that a reasonable person in the defendant's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest, in order to find that a defendant was in custody. *Ali*, 68 F.3d at 1472. The court must examine the totality of the circumstances, *Ruggles*, 70 F.3d at 264–65, and may consider the person's background, experience, familiarity with police questioning and *Miranda* rights, age, maturity, education, and intelligence. *Id.*

Although Mercado was questioned on August 17, 1995, *see Innis*, 446 U.S. at 298–302, 100 S.Ct. at 1688–90, his meeting with the police on that day was not custodial. First, as discussed earlier, a police officer's subjective belief or view about whether the subject of an interview is a suspect in a criminal investigation, is inconsequential in the custody analysis. *Stansbury*, 511 U.S. at 322–26, 114 S.Ct. at 1529–30. As a result, the fact that Lieutenant Boyce already suspected, based on information from the informant Quick, that Mercado had been involved in the armored car robbery, (Tr. 93; Tr.2 at 3, 7), does not render the interview custodial.

Moreover, the manner in which Boyce conducted the interview is free of the indicia of arrest that would lead a reasonable person in Mercado's position to believe that he was subject to the restraints associated with formal arrest. *Ali*, 68 F.3d at 1472. Boyce asked, rather than ordered, Mercado "if he would like to come" to the precinct and Boyce did not threaten that he would arrest or handcuff Mercado for noncompliance. (Tr. 35, 97.) *Guarno*, 819 F.2d at 32. Mercado also was not handcuffed during the ride in Boyce's van to the police station or during the interview. (Tr. 36, 99.) *United States v. Averell*, 296 F.Supp. 1004, 1019 (E.D.N.Y. 1969). The officers expressly told Mercado that he was free to leave, (Tr. 103, 128–29), *Guarno*, 819 F.2d at 30, and although Mercado indicated a desire near the end of the interview to leave, (Tr. 103, 128–29), he did not actually attempt to do so. (Tr. 129.) I am satisfied that Mercado did have that

---

7. Again, the Government has agreed to redact Mercado's reference to Ingram and Sandoval.

(Gov't Mem. at 5.)

choice but that he ultimately continued to speak with the officers until the conclusion of the interview, when Lieutenant Boyce drove Mercado home. (Tr. 117.)

Based on all these factors, the totality of the circumstances dictate that a reasonable person in Mercado's position would not have believed himself to be subject to the restraints normally associated with a formal arrest. As a result, the interview was not custodial, and *Miranda* warnings were not required.

 b. *Was the January 19, 1996 arrest supported by probable cause?*

■ Defendant Mercado was advised of his *Miranda* rights before he made statements on January 19, 1996, and therefore, there is no *Miranda* issue with regard to those statements. Instead, Mercado has moved to suppress those statements on two other grounds: (1) that his arrest lacked probable cause and so his statements are suppressible under the "tainted fruit of the poisonous tree" doctrine and (2) that his statements were obtained due to the officers' purposeful delay in seeking Mercado's arraignment.

Where an arrest is made without a warrant, it must be made upon probable cause. *United States v. Fisher,* 702 F.2d 372, 375 (1983). Statements made by a defendant whose arrest lacked probable cause are inadmissible where no intervening events break the connection between his illegal detention and his incriminating statements. *Dunaway v. New York,* 442 U.S. 200, 217–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979). Since Mercado's arrest was made without a warrant, it is therefore necessary to determine whether the police had probable cause to arrest Mercado without a warrant on January 19, 1996.

Probable cause exists when "the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *Fisher,* 702 F.2d at 375. Information relied on by the police must be specific in that it

cannot apply to any number of persons without reasonably singling out from that the group the person arrested. *Id.* at 375–76 (citing *Wong Sun v. United States,* 371 U.S. 471, 481, 83 S.Ct. 407, 413–14, 9 L.Ed.2d 441 (1963); *United States v. Jackson,* 652 F.2d 244, 247–48 (2d Cir.), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *United States v. Rosario,* 543 F.2d 6 (2d Cir.1976)).

Probable cause may be based on information obtained from an informant, *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Elgisser,* 334 F.2d 103, 109 (2d Cir.), *cert. denied,* 379 U.S. 881, 85 S.Ct. 151, 13 L.Ed.2d 87 (1964), particularly when that information is corroborated by others. *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Chin Dan Fook,* 413 F.2d 1016 (2d Cir.1969), *cert. denied,* 397 U.S. 928, 90 S.Ct. 936, 25 L.Ed.2d 107 (1970). An informant's reliability must not be assessed according to a rigid definition. *Illinois v. Gates,* 462 U.S. 213, 230–34, 238–39, 103 S.Ct. 2317, 2328–30, 2332–33, 76 L.Ed.2d 527 (1983) (rejecting old *Aguilar–Spinelli* test and adopting totality of the circumstances analysis). Rather, the court should assess all the attending circumstances to determine whether " 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale' .... " *Gates,* 462 U.S. at 244–45, 103 S.Ct. at 2335.

Here, the facts and circumstances that were known to the police when they arrested Mercado included Sidney Quick's information that William Rivera had informed him of Rivera's own participation, along with Mercado, Ingram and Sandoval, in the March 1992 robbery. This information was reasonably trustworthy. The fact alone that Quick was incarcerated and was a cooperating witness partially for his own benefit, does not damage his reliability to the extent to make his information unusable. *Id.* And as Quick's information was corroborated and elaborated upon by Lisa Rivera, the sister of William Rivera, any question as to Quick's veracity is diminished. *Id.* at 244, 103 S.Ct. at 2335. Concededly Ms. Rivera is an admitted drug

user with a criminal history, (Tr. 28–29), however that alone is insufficient to make her information. inherently untrustworthy. *Gates,* 462 U.S. at 244, 103 S.Ct. at 2335. Rivera had told the police of Mercado's presence in her apartment three to four times while he, William Rivera, Ingram and Sandoval planned the armored car robbery. (Tr. 2 11–12.) Rivera used Mercado's full name in describing him. (Tr. 2 at 2.) She indicated that Mercado received directions from her brother during the meetings to be at the scene of the robbery at approximately 8:00 a.m. Rivera also told police that Mercado beeped her brother while William Rivera was at Ms. Rivera's apartment and that she overheard her brother tell Mercado the robbery location. (Tr. 2 13–14.) Ms. Rivera told police that Mercado was in her apartment, along with Ingram, Sandoval, and Rivera, later on in the day of the robbery. (Tr. 2 16.) There she saw her brother give Mercado one of the envelopes filled with cash that he removed from a shoebox.

The police also had the statements of Maria Montenez, William and Lisa Rivera's mother, about whom no impeaching testimony has been offered. *Id.* at 244–46, 103 S.Ct. at 2335–36. Montenez stated that she saw Mercado, along with Ingram, Sandoval, Rivera and Zahrey in her apartment a day or two after the robbery, that the men were laughing and giggling, and that a sum of currency was on the table. (Tr. 2 17–19.)

In addition, the information provided by Mercado himself, in August, 1995, gave the police further basis to reasonably believe that he had participated in the March 1992 armored car robbery. Mercado admitted that he went to Florida with Sandoval, Ingram, and Rivera shortly after the robbery, and that he bought a new car within that period of time. Mercado's information, taken in light of the information provided by the informant and witnesses, bolstered the police officers' belief that Mercado was indeed a participant in the robbery. *Id.*

In sum, I find the police had a sufficient amount of reliable, incriminating information about Mercado to constitute probable cause for his warrantless arrest on January 19, 1996.

c. *Were the January 19, 1996 statements obtained in an interrogation that caused a purposeful delay in arraignment?*

██ Defendant Mercado also argues that he made his January 19, 1996 statements during an interrogation that was designed to cause a purposeful delay in seeking arraignment and which thereby rendered the interrogation coercive. Defendant argues that pursuant to New York law, the six hour delay between Mercado's arrest and his arraignment is prohibited by New York Criminal Procedure Law § 140.20(1). The Government argues that this issue is controlled by federal law and that the six hour delay is permissible under 18 U.S.C. § 3501(b).

Federal law applies to this issue,[8] but in any event, I find that the six hour delay between arrest and arraignment is permissible under both federal and New York law.

18 U.S.C. § 3501 states that in a criminal prosecution by the United States, a defendant's confession is not rendered inadmissible by a delay in bringing the defendant before a judge or magistrate as long as three factors are satisfied. First, the confession must have been made within six hours following the arrest or detention; second, the judge must find that the confession was voluntary; and third, the weight of the confession must be left for the jury to determine, 18 U.S.C. § 3501. Defendant Mercado's statements were made within the six hour period because he was arrested at 9:15 a.m., (Tr. 135), Sergeant Wirth began interviewing Mercado at 11:45 a.m., and the interview ended at 1:25 p.m. (Tr. 140.) Thus, because there are no other indications that the statements were not voluntary, the statements are admissible under federal law.

8. Section 3501 of Title 18 of the United States Code is set forth within Part II of that Title, which is entitled "Criminal Procedure." It is well established that in federal court, federal rules of procedure apply. 18 U.S.C. § 3007; FED. R. CRIM. P. 54 ("These rules apply to all criminal procedures in the United States District Court...").

New York Crim. P. 140.20(1) states that police are bound to bring a suspect before a local criminal court and file an appropriate accusatory instrument without unnecessary delay. "Whenever a defendant is interrogated during an unnecessary delay in his arraignment, the court presume that the delay was for the purpose of taking the statement...." *People v. Moore,* 133 Misc.2d 900, 904–05, 509 N.Y.S.2d 259, 263 (Sup.Ct. 1986) (citing *People v. Cooper,* 101 A.D.2d 1, 10, 475 N.Y.S.2d 660 (4th Dep't 1984); *People v. Blake,* 35 N.Y.2d 331, 340, 361 N.Y.S.2d 881, 320 N.E.2d 625 (1974)). An unreasonable delay, however, is one that is obviously unnecessary and lengthy in duration. *Id.,* 509 N.Y.S.2d at 264; *see, e.g., People v. Lockwood,* 44 N.Y.S.2d 769, 770, 406 N.Y.S.2d 37, 377 N.E.2d 481 (1978), *rev'g,* 55 A.D.2d 17, 21, 389 N.Y.S.2d 583, 585 (N.Y.App.Div.1976) (20 hour delay); *People v. Cooper,* 101 A.D.2d 1, 2, 475 N.Y.S.2d 660, 662 (N.Y.App.Div.1984) (24 hour delay); *People v. Jones,* 87 A.D.2d 761, 761, 449 N.Y.S.2d 56, 58 (N.Y.App.Div.1982) (20–hour delay); *People v. Lindo,* 85 A.D.2d 643, 645, 444 N.Y.S.2d 929, 931 (N.Y.App.Div.1981) (at least a 20–hour delay); *People v. Collazo,* 98 Misc.2d 58, 59–61, 412 N.Y.S.2d 943, 944–45 (Sup.Ct.1978) (22 hour delay).

The delay in this case between defendant Mercado's arrest and his arraignment, during which time he was interviewed, lasted approximately five hours. As such, it was not such a lengthy or obviously unnecessary delay as to be unreasonable. Accordingly, no presumption is created and defendant Mercado's statements were voluntary.

d. *Should testimony as to Mercado's physical reaction be precluded?*

■ Defendant Mercado also moves to exclude Lieutenant Boyce's testimony that Mercado was visibly nervous, perspiring heavily and speaking in a halting manner when he responded to certain questions. Mercado claims that Boyce's testimony should be excluded because Mercado's physical manner "was not a testimonial response to interrogation." (Mercado Mem. at 6.) Mercado's reliance on *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), in support of this proposition, however, is misplaced.

*Muniz* held that the Fifth Amendment privilege against self-incrimination does not protect a suspect from being compelled to produce " 'real or physical evidence.' " *Muniz,* 496 U.S. at 589, 110 S.Ct. at 2643 (citing *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966)). "Rather, the privilege 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' " *Id.* (citing *Schmerber,* 384 U.S. at 761, 86 S.Ct. at 1830).[9] The Supreme Court has held that an accused's communication is testimonial where it, explicitly or implicitly, relates a factual assertion or discloses information. *Id.* (citing *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988)). Physical gestures, behaviors, and conduct are not testimonial and thereby are not subject to suppression when they are obtained in violation of the Fifth Amendment (that is, without advice of *Miranda* rights). *See id.* at 591–606, 110 S.Ct. at 2644–53. *See, e.g., Schmerber,* 384 U.S. at 763–64, 86 S.Ct. at 1831–32; *United States v. Wade,* 388 U.S. 218, 223, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967); *United States v. Dionisio,* 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). In addition, "any slurring of speech and other evidence of lack of muscular coor-

---

9. See defendant Mercado's Memorandum of Law, which states,

> The testimony of Lt. Boyce that Mr. Mercado was visibly nervous, perspiring heavily and talked in a halting manner, when he denied that he was involved in or had any knowledge of a March 20, 1992 armored car robbery, Tr. 39, should not be admitted into evidence *as it was not a testimonial response to interrogation. Pennsylvania v. Muniz* [496 U.S. 582], 110 S.Ct. 2638 [110 L.Ed.2d 528] (1990). This "statement" is neither a confession, admission or assertive conduct of any kind. Therefore, it cannot be said to be a declaration by the maker of any kind and the prosecution should be precluded from gaining an implicit admission by conduct where Mr. Mercado explicitly denied complicity in the alleged crime.

(Mercado Mem. at 6–7 (emphasis added).)

dination revealed by [defendant's] responses to [the officer's] direct questions constitute nontestimonial components of those responses." *Muniz*, 496 U.S. at 592, 110 S.Ct. at 2645. Consequently, defendant Mercado's physical responses, the visible nervousness, the perspiration and the halting voice, are physical characteristics and nontestimonial components of his responses to Lieutenant Boyce's questions. As such, they do not acquire protection of the Fifth Amendment privilege against self-incrimination. Suppression of those physical responses, therefore, is not required when the police fail to give *Miranda* warnings.

e. *Are the statements excludable hearsay?*

 Finally, Mercado seeks to preclude his statements as hearsay. FED. R. EVID. 802. The Government is correct, however, that the statements constitute party admissions, which are excluded from the definition of hearsay by Rule 801(d)(2)(A) of the Federal Rules of Evidence. To qualify as an admission, the statement must (1) be offered against a party and (2) be the party's own statement. FED. R. EVID. 801(d)(2)(A). Here the Government has satisfied both prongs, since it is the Government that seeks admission of defendant Mercado's statements and the statements were in fact made by Mercado. (Tr. 38–40, 105, 140, 157–58.)

An admission must be contrary to the party's position at trial. *O'Donnell v. Georgia Osteopathic Hosp., Inc.,* 748 F.2d 1543, 1548 n. 6 (11th Cir.1984) ("An admission must only be contrary to the trial position of the party against whom it is offered."). Here, Mercado's statements, that he was friends with

Ingram, Sandoval and Zahrey and that he knew William Rivera, are at a minimum evidence of association with his criminal confederates. Moreover, Mercado's admissions that he went to Florida with his co-defendants, and bought a new car both shortly after the armored car robbery, inculpate him, at least circumstantially, in the crime.[10] *Scholle v. Cuban–Venezuelan Oil Voting Trust,* 285 F.2d 318 (2d Cir.1960) (hearsay rule does not bar admission of statements used circumstantially). This contradicts his position that he is innocent of the crimes of which he, Ingram, Sandoval and Zahrey are accused, and as such are party admissions under Rule 801(d)(2)(A).[11]

In sum, the Government has proven by a preponderance of the evidence that (1) defendant Mercado's August 17, 1995 statements were not obtained in a custodial interrogation, (2) Mercado's January 19, 1996 arrest was supported by probable cause; (3) Mercado's January 19, 1996 statements were not obtained during an interrogation that caused a purposeful delay in reaching arraignment; (4) Mercado's physical reactions to questions were not testimonial; and (5) Mercado's statements are admissions and/or statements against interest. As a result, Mercado's statements were not obtained in violation of the Fourth or Fifth Amendments and they are not excludable under the hearsay rule. Accordingly, it is respectfully recommended that defendant Mercado's motion to suppress be denied.

4. *Defendant Eric Sandoval*

Defendant Eric Sandoval was arrested without a warrant on July 21, 1995 for an

---

**10.** As discussed earlier, Mercado's references to Ingram, Zahrey and Sandoval will be redacted pursuant to the *Bruton* doctrine. (Gov't Mem. at 5.)

**11.** Defendant Mercado makes reference in his papers to Rule 804(b)(3) of the Federal Rules of Evidence, which provides that statements against interest are not excluded by the hearsay rule when the declarant is unavailable to testify. FED. R. EVID. 804(b)(3). Mercado argues that his statements were not against his interest at the time they were made, and therefore, they are excludable hearsay. Even if the statements were not admissions, they constitute statements

against interest because (1) the declarant is unavailable and (2) that the statements "at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." FED. R. EVID. 804(b)(3); *see* FED. R. EVID 804(a)(1); *United States v. Bakhtiar,* 994 F.2d 970, 977 (2d Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993) *and reh'g denied,* 511 U.S. 1047, 114 S.Ct. 1580, 128 L.Ed.2d 222 (1994); *Williamson v. United States,* 512 U.S. 594, 601–05, 114 S.Ct. 2431, 2436–37, 129 L.Ed.2d 476 (1994).

assault of an individual named Frank Farmer. (Tr. 142.) Sergeants Wirth, Sadler and Winsper arrested Sandoval outside his house and took him to a hotel on Staten Island to seek his cooperation in the IAB investigation of Zahrey and the armored car robbery. (Tr. 142–43.) Sandoval was not informed of his *Miranda* rights when he was arrested or during the interrogation at the hotel. (Tr. 143.) Wirth testified that on the way to the hotel, he and the other officers merely exchanged pleasantries with Sandoval. (Tr. 169.)

At the hotel, the officers brought Sandoval into a hotel room, where he was handcuffed to a chair. (Tr. 173, 175.) With the approval of the District Attorney's office, Wirth informed Sandoval that "if he cooperated with [the] investigation, nothing would be used against him that day. And if he did cooperate and then reneged on that cooperation, then those statements would be used against him." (Tr. 144, 174.) According to Wirth, Sandoval did not answer either yes or no to that proposition. (Tr. 144.) Wirth then asked Sandoval, based on information he had seen in an ATF case folder, the identity of the individual for whom Sandoval had been selling guns.[12] (Tr. 144, 145.) Sandoval said that it had been William "Supreme" Rivera. (Tr. 145.) Wirth also asked about Ingram, Mercado and Zahrey. (Tr. 146.) He answered that Javi Mercado worked in construction, that Ingram was in the trucking business, and that he had met Zahrey only once, at William Rivera's funeral. (Tr. 146.) He described Zahrey's demeanor at the funeral as distraught and crying. (Tr. 146.) Wirth testified that Sandoval denied any participation in criminal activity, and denied knowledge of what Ingram and Mercado were doing. (Tr. 146–47, 177.)

The group remained in the hotel room for approximately four hours, during which time, the officers offered Sandoval something to eat. (Tr. 175.) Wirth testified that during the questioning at the hotel room, the officers did not ask Sandoval about the underlying assault charge for which he had been arrested. (Tr. 177.) Rather, questioning was limited to the IAB investigation of the armored car robbery. (Tr. 177.) Wirth also testified that after the questioning was concluded, he called the Brooklyn District Attorney's office to advise them of the status of the debriefing. (Tr. 178.) Wirth told Mr. Guryea, of the District Attorney's office, that Sandoval would not cooperate in the investigation "based on the fact that he didn't have the kind of information that [Wirth] was looking for, that he didn't give [Wirth] the answers that [he] was looking for." (Tr. 179.) The officers then left the hotel room with Sandoval and went to the Kings County District Attorney squad for fingerprinting and arrest processing. (Tr. 180.)

### a. Can statements be used for cross-examination purposes?

■ The Government has conceded that the police did not advise defendant Sandoval of his *Miranda* rights before performing the custodial interrogation on July 21, 1995. If defendant Sandoval chooses to testify, however, the Government will seek to use Sandoval's statements to police on cross-examination as impeachment evidence. Defendant Sandoval argues that the statements are not admissible for that purpose because his statements were involuntary.

In *Harris v. New York*, 401 U.S. 222, 226–27, 91 S.Ct. 643, 646–47, 28 L.Ed.2d 1 (1971), and *Oregon v. Hass*, 420 U.S. 714, 722–24, 95 S.Ct. 1215, 1220–22, 43 L.Ed.2d 570 (1975), the Supreme Court has held that voluntary statements which have been made in the absence of *Miranda* warnings are admissible for impeachment purposes only. The rationale behind this rule is that the policy of deterring perjury outweighs the utility of prevent police misconduct. *New Jersey v. Portash*, 440 U.S. 450, 458, 99 S.Ct. 1292, 1296–97, 59 L.Ed.2d 501 (1979) (discussing *Harris*, 401 U.S. at 222, 91 S.Ct. at 644 and *Hass*, 420 U.S. at 714, 95 S.Ct. at 1217). Involuntary statements, however, are inadmissable, even for purposes of impeachment. *United States v. Brown*, 699 F.2d 585, 590

---

**12.** Defendant Sandoval was scheduled to surrender to federal authorities on gun selling charges on July 24, 1995. (Tr. 142.)

(2d Cir.1983); *see also Portash,* 440 U.S. at 458–459, 99 S.Ct. at 1296–97. The underlying theory is that, where an involuntary statement has been coerced, a defendant's Fifth Amendment right against compulsory self-incrimination prohibits courts from applying the balancing test that was used in *Harris* and *Hass. Brown,* 699 F.2d at 590 (discussing *Portash,* 440 U.S. at 450, 99 S.Ct. at 1292–93). Thus, where a defendant has not been given *Miranda* warnings, involuntary statements may not be used for impeachment purposes.

Defendant Sandoval has cited two factors in support of his argument that his statements were involuntary: (1) that the police offered Sandoval immunity, and (2) that the interrogation constituted an unreasonable pre-arraignment delay. The Second Circuit has made clear that " 'a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.' " *United States v. Bye,* 919 F.2d 6, 9 (2d Cir.1990) (quoting *United States v. Guarno,* 819 F.2d 28 (2d Cir.1987)); *see also United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995); *United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Alvarado,* 882 F.2d 645, 650 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Pomares,* 499 F.2d 1220 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Major,* 912 F.Supp. 90, 95 (S.D.N.Y.1996); *United States v. Broccolo,* 797 F.Supp. 1185, 1194 (S.D.N.Y.1992). *Cf. United States v. Anderson,* 929 F.2d 96, 100–02 (2d Cir.1991) (where government's statements are false and misleading by suggesting that suspect must choose between cooperation and the right to counsel, suspect's statements are involuntary). Here, nothing in the record suggests that police made false or misleading statements to Sandoval about his potential cooperation. (Tr. 144, 166–67.) As a result, the fact alone that he was asked to cooperate and was promised immunity if he chose to cooperate does not render his statements involuntary. (In addition, Sandoval, in fact never agreed to cooperate. (Tr. 144, 179.))

The Government also has established that the police interrogation of defendant Sandoval did not cause an unreasonable delay in reaching an arraignment; therefore, the duration of the interrogation did not render Sandoval's statements involuntary. The fact that a statement has been obtained during a period of less than six hours of pre-arraignment delay, 18 U.S.C. § 3501, weighs against a finding that the statement is involuntary. *United States v. Toney,* 579 F.Supp. 652, 656 (S.D.N.Y.1984) (citing *United States v. Rubio,* 709 F.2d 146, 153 (2d Cir.1983)), *aff'd,* 733 F.2d 1026 (2d Cir.1984). Defendant Sandoval's statements were made within the requisite six hour period because he was picked up by the police at 1:45 p.m. and brought to Central Booking at 7:00 p.m. (Tr. 182–83.) Moreover, the five and one quarter hour period would not be considered an unreasonable delay under New York law. *See People v. Lockwood,* 44 N.Y.2d 769, 770, 406 N.Y.S.2d 37, 377 N.E.2d 481 (1978), *rev'g,* 55 A.D.2d 17, 21, 389 N.Y.S.2d 583, 585 (N.Y.App.Div.1976) (20 hour delay); *People v. Cooper,* 101 A.D.2d 1, 2, 475 N.Y.S.2d 660, 662 (N.Y.App.Div.1984) (24 hour delay); *People v. Jones,* 87 A.D.2d 761, 761, 449 N.Y.S.2d 56, 58 (N.Y.App.Div.1982) (20–hour delay); *People v. Lindo,* 85 A.D.2d 643, 645, 444 N.Y.S.2d 929, 931 (N.Y.App.Div.1981) (at least a 20–hour delay); *People v. Moore,* 133 Misc.2d 900, 509 N.Y.S.2d 259 (Sup.Ct.1986); *People v. Collazo,* 98 Misc.2d 58, 59–61, 412 N.Y.S.2d 943, 944–45 (Sup.Ct.1978) (22 hour delay). Accordingly, no presumption of unreasonableness is created with respect to the delay and defendant Sandoval's statements were not rendered involuntary by the duration of the interrogation. Because Sandoval's statements were voluntary, they are admissible for cross-examination purposes if defendant Sandoval testifies at trial.

## CONCLUSION

For the reasons discussed above, it is respectfully recommended that defendants' motions to suppress be denied. Specifically, with regard to defendant Zahrey, the Government has proven by a preponderance of the evidence that the modification was not custodial and that Zahrey was not subjected

to interrogation or its functional equivalent. Accordingly, *Miranda* warnings were not required, and the statements made by Zahrey should not be suppressed. I also found that because Zahrey's statements were not made in a custodial setting, he was not entitled to Fifth Amendment protection, and it is therefore inconsequential that certain statements were made after he requested counsel. And finally, the Government established by a preponderance of the evidence that Zahrey was not coerced into making statements merely by the existence of his employment relationship with the police.

With respect to defendant Mercado, the Government has established by a preponderance of the evidence that the setting in which he was interrogated in August, 1995 was not custodial and as a result, *Miranda* warnings were not required. Second, the Government has established by a preponderance of the evidence that the officers had probable cause on which to base Mercado's arrest in January, 1996 and Mercado's statements, therefore, are not suppressible as the tainted fruit of the poisonous tree (an unlawful arrest). Also, I have found that Mercado's January, 1996 statements were not elicited by causing a purposeful delay in reaching arraignment. Moreover, I have found that Mercado's statements constituted party admissions and/or statements against interest and thereby are not excludable by the hearsay rule. And finally, Mercado's physical responses to questions were not testimonial; they thereby do not warrant Fifth Amendment protection, and accordingly, could not have been obtained in violation of the Fifth Amendment.

With respect to defendant Eric Sandoval, I have found that his statements were not rendered involuntary by either the police's offer of immunity if Sandoval cooperated, or by the reasonable delay caused by the five and one quarter hour interrogation after his arrest. As a result, his statements are admissible on cross-examination.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

SO ORDERED.

Dated: April 1, 1997.