OPINION OF THE COURT
Jack Rosenberg, J.
Defendant is charged with arson in connection with a fire that occurred on December 17, 1977 at 2075 Walton Avenue, Bronx, New York. Following are the court’s findings of fact and conclusions of law as determined beyond a reasonable doubt after a Huntley hearing held on June 22 and 23, 1978.
FINDINGS OF FACT
On Saturday, December 17, 1977, shortly after 8:00 p.m., Police Officer Francis Connelly and his partner responded to a fire department radio call reporting a fire at 2075 Walton Avenue. They encountered defendant in the hallway of the building and defendant volunteered the information that he was there checking his wife’s apartment as she was away for *60 the evening and that he had discovered the fire and attempted to put it out. After receiving Miranda warnings, defendant offered to accompany the officers to the apartment where his wife was staying in order to confirm his story. Defendant’s wife, however, told the officers that she was estranged from her husband and that he had left angrily earlier in the evening after she had refused a reconciliation. Defendant then said that his prior statement was inaccurate and he was taken to the 48th Precinct where, prior to questioning, he was again advised of his Miranda rights which he again knowingly, intelligently and voluntarily waived. Defendant admitted setting the fire to get back at his wife for spurning his proposed reconciliation. Officer Connelly testified that he asked defendant if he would be willing to make a statement to an Assistant District Attorney and that defendant indicated that he was, but no statement was taken that evening.
Following defendant’s statement to him, Officer Connelly filled out an arrest report at 10:30 p.m. and brought defendant to Bronx Central Booking,[1] arriving an hour later. Defendant’s identification photo and fingerprints were taken and he was interviewed by pretrial services agency for bail purposes. Although Officer Connelly testified that the booking process was completed on the 17th, Police Officer Anthony Amelio of Bronx Central Booking testified that booking could not have been completed that evening because the rap sheets allegedly required for taking mug shots would not be available that quickly. However, there is credible evidence indicating that the rap sheets were received from New York State Identification and Information Services at 3:29 a.m. on December 18, 1977, so that there was no reason defendant could not have been arraigned promptly at 1:00 p.m. on the 18th when the Criminal Court opened.
On the morning of December 18, defendant was taken from the 42nd Precinct where he had been lodged overnight and brought back to Bronx Central Booking at 11:00 a.m., an hour earlier than the other prisoners to be arraigned that day. The arresting officer testified that although the complaint against the defendant had been dictated and put in draft, he had not signed it because the Assistant District Attorney handling the matter had instructed him not to do so without his approval *61 and that the officer’s signing of the complaint was to be delayed until the Assistant District Attorney had interviewed the defendant. He also testified that he had informed the Assistant District Attorney that the defendant was willing to give the Assistant District Attorney a statement. That statement was taken by the Assistant District Attorney between 12:38 p.m. and 1:01 p.m. While the stenographic transcript of the statement shows that defendant was advised of and waived his Miranda rights, it also shows that the Assistant District Attorney in his questioning of defendant learned that defendant was in severe physical pain from a back injury, yet took no steps to see that defendant’s pain was treated and was also made aware that defendant had a history of treatment for mental illness. It is also clear on the record that although Legal Aid attorneys were available to provide defendant with counsel from noon on, the Assistant District Attorney took defendant’s statement without providing him with counsel and defendant’s case was not docketed until 3:12 p.m. and he was not arraigned until 6:00 p.m. on that day.
At the Huntley hearing, defendant testified that he was born in Puerto Rico in 1945 and came to this country five years later. He completed the ninth grade but states he can neither read nor write although he understands English. He has never held a job nor served in the military and lives on public assistance. Defendant has had several previous encounters with the police and has four prior convictions on his record. When he was 15, defendant spent a year in Rockland State Hospital for mental problems although the nature of his then condition was not disclosed, but having observed defendant on the witness stand, however, the court finds him knowledgeable and responsive and sees no evidence of any alleged impairment of either his mental process or ability to understand the English language.
Dr. Joy Roy, a clinical psychologist who examined defendant at the Bronx House of Detention, testified that she administered the Weschler Intelligence Test to him and that she felt his real functioning was most accurately reflected in his performance I. Q. of 73, which represents "borderline” intelligence. During Dr. Roy’s lengthy testimony, she indicated that defendant at least had the "potential” to understand the Miranda warnings given him, although his ability to do so might be impaired by the tensions of the situation in which he found himself. When asked if defendant’s familiarity with the *62 criminal justice system would affect his ability to comprehend and knowingly, intelligently and voluntarily waive his Miranda rights, Dr. Roy testified that it might improve his ability to do so and, as noted above, after observing defendant on the witness stand, the court finds that he had the requisite ability and understanding to waive those rights. This does not mean, however, that the court has paid no heed to Dr. Roy’s testimony regarding his psychological need to seek to please "authority figures”, especially as it bears on his interview with Assistant District Attorney Leviss, an "authority figure” of a higher order than a police officer.
CONCLUSIONS OF LAW
The initial questions before the court are simple ones: (1) did this defendant have the requisite mental capacity to knowingly, intelligently and voluntarily waive his Miranda rights when he was questioned by Officer Connelly on December 17, 1977; (2) whether this statement to Assistant District Attorney Leviss on December 18, 1977 is inadmissible. The fact that defendant may be of substandard intelligence is not determinative since requisite capacity has been found where a defendant is mentally retarded (People v Blocker, 31 AD2d 885), or has an I. Q. more or less equal to that of this defendant (People v Chaffee, 42 AD2d 172; People v Caruso, 45 AD2d 804; People v Lux, 34 AD2d 662, affd 29 NY2d 848). While it is true that in some of these cases there were some indicia of normal functioning not here present, such as the ability to read and write, or to hold a steady job, the critical factor is that after carefully observing the defendant when he testified at the Huntley hearing, I am convinced beyond a reasonable doubt that this defendant was capable of understanding his Miranda rights and that his waiver of those rights was knowing, intelligent and voluntary as regards his statements to Officer Connelly. This conclusion is buttressed by the fact that defendant was no novice when it came to dealing with the police and that any emotional pressures on defendant arising from his being interrogated by the police were insufficient to render his waiver of his Miranda rights involuntary, unintelligent or unknowing in light of the totality of the evidence adduced. However, with respect to the statement defendant made to Assistant District Attorney Leviss, I am not convinced beyond a reasonable doubt that defendant’s waiver at that time meets the requisite standards. This *63 conclusion is based primarily on the fact that defendant was in such severe pain during the interview that Assistant District Attorney Leviss noticed it and, in addition, Dr. Roy’s testimony was that of defendant’s psychological attitude is such that when confronted by Assistant District Attorney Leviss he felt compelled to answer the questions put to him by waiving his Miranda rights. This conclusion of law might be sufficient in and of itself to grant suppression of these statements but, as will be discussed below, there is another ground which requires this court to do so.
Suppression is denied as to the statements made by defendant to Officer Connelly on December 17, 1977. Defendant was properly advised of his Miranda rights on several occasions and, as hereinabove set forth, I am convinced beyond a reasonable doubt that defendant, as testified to by Officer Connelly, showed the capacity to and did in fact voluntarily, knowingly, and intelligently waive those rights before making those statements. Such testimony of Officer Connelly that I have accepted as credible is buttressed by observations of the defendant by me on the hearing.
 There is a serious constitutional problem, however, with respect to the statements made by defendant to Assistant District Attorney Leviss inasmuch as it is settled law in New York that once a defendant’s right to counsel attaches, a defendant may not waive that right without his attorney being present (People v Hobson, 39 NY2d 479). In Kirby v Illinois (406 US 682, 688), the Supreme Court held that the Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated”. This was construed by the Court of Appeals in People v Blake (35 NY2d 331, 339-340), in which that court declared that in New York "a criminal action begins with the filing of an 'accusatory instrument’ as defined by statute, which serves as the basis for prompt arraignment * * * [but] [s]ince such a rule offers opportunity for delay between arrest and the filing of an accusatory instrument, an undue delay is prima facie a suspect circumstance suggesting that the delay may have been for the purpose of depriving the accused of counsel”. In the instant case, it is clear that there was a deliberate delay in defendant’s arraignment based on the District Attorney’s desire to take from defendant an additional statement, as evidenced by the fact the Criminal Court complaint had been prepared prior to the time of the interview with Assistant *64 District Attorney Leviss but had not been signed by Officer Connelly because Assistant District Attorney Leviss had so instructed him.
What the Assistant District Attorney in effect did, with the police collaborating, was to deliberately postpone defendant’s arraignment, thereby delaying his right to obtain counsel in order to get from him a stenographic statement taken by the prosecutor, a lawyer. This is a scheme to deny defendant counsel, even if he voluntarily waived his Miranda rights in his statement to police. This conduct by the prosecutor I hold to be improper.
While it is true that "undue delay” is a relevant but not dispositive factor (People v Carbonaro, 21 NY2d 271), it is manifest that when arraignment is delayed for the sole purpose of permitting the prosecutor to take an additional statement from a defendant in the absence of counsel, such statements are inadmissible (People v Turchiarelli, 26 AD2d 898).
There is no question but that the instant case presents a much closer question than Turchiarelli (supra) or other precedents arguably on point such as People v Richardson (25 AD2d 221). In that case, the statements that were suppressed were taken from defendants who had been turned over to the Criminal Court immediately prior to arraignment, the implication being that the accusatory instrument had already been docketed with the court. The same was true in People v Lawrence (29 AD2d 829) and People v Reyes (NYLJ, Nov. 11, 1976, p 11, col 5) where similar statements were ruled inadmissible.
In People v Veitch (26 AD2d 764), however, the defendant had not been processed to the extent that this defendant had, in that Veitch had been arrested and was at police headquarters when, after four hours of interrogation, he made inculpatory statements erroneously received at trial. True, unlike this defendant, Veitch was never advised of his rights, although he did not request counsel, but I think it significant that the Appellate Division noted that since defendant was in custody after arrest and had been "booked” on the police blotter, it was "clear that the alleged crime had passed the investigatory stage and had reached the accusatory level” (p 764). Indeed, there the delay in arraignment was only one and one-half hours to enable the police to type his statement and have it signed.
An almost identical issue to that now before me arose in *65 People v Lockwood (55 AD2d 17). Maurice Lockwood was arrested on October 17, 1973 at about 10 p.m., but was not turned over to the court for arraignment for almost 20 hours. On the day following his arrest, Lockwood was awaiting arraignment in Bronx Central Booking when an Assistant District Attorney had him brought to his office, arraignment being delayed thereby. After being given proper Miranda warnings, Lockwood made incriminating statements used against him at trial. Although deeming the question of admissibility "perplexing and grave”, the majority held that the admission of the statement, if error, was harmless error. Justice Capozzoli, in a vigorous dissent, argued that the right to counsel had attached and that admitting a formal inculpatory statement was not "harmless error.” On appeal, the Court of Appeals reversed and ordered a new trial on the strength of that dissent.
Although there are differences between Lockwood and the instant case, e.g., Lockwood’s attempt to contact an attorney after his arrest and the fact that there, unlike here, the prosecutor yanked defendant out of the arraignment process without any indication that defendant was willing to speak to him,[2] it is clear that the factors cited in Justice Capozzoli’s opinion apply with equal force to this case where the booking process had been completed, the criminal complaint prepared and the arraignment delayed solely because the prosecutor desired to get a statement from defendant before turning him over to the court when he would be represented by Legal Aid attorneys who, as noted above, were present in the building when the statement was taken. "To distinguish this case, where the defendant [was] awaiting arraignment, would be to put form over substance” (People v Richardson, 25 AD2d 221, 224, supra, cited with approval by Justice Capozzoli 55 AD2d 17, 22, supra). Consequently, even if this defendant had not been in obvious pain during his interview with Assistant District Attorney Leviss and had been free of any possible pschological impairment, I would still suppress the statements made to Assistant District Attorney Leviss on the ground that once a crime reaches the "accusatory level” and a defendant has been booked, the People cannot postpone his right of *66 access to counsel by delaying the execution and filing of the accusatory instrument against him in order to obtain a statement from such defendant. To rule otherwise would effect a deprivation of the constitutional right to counsel which attaches when the accusatory instrument is filed and cannot be waived thereafter except in the presence of defendant’s attorney.

. Although under the "control” of the police department, Bronx Central Booking is located in the Criminal Court Building, in which access to Legal Aid representation is readily available.

. But note that although this defendant allegedly raised no objections to speaking to Assistant District Attorney Levisss, he did not volunteer to do so as was true in People v Camalo (NYLJ, March 7, 1977, p 11, col 2) where suppression was denied on that basis under virtually identical circumstances to those here present.