Charles SINGLETARY, Petitioner,

v.

Brian FISCHER, Superintendent, Sing Sing Correctional Facility, Respondent.

No. 01–CV–8016.

United States District Court, E.D. New York.

April 20, 2005.

Barry Gene Rhodes, Esq., Brooklyn, NY, for Petitioner.

Linda Susan Breen, Assistant District Attorney, Office of the Kings County District Attorney, Brooklyn, NY, for Respondent.

## MEMORANDUM, ORDER and JUDGMENT

WEINSTEIN, Senior District Judge.

### I. *Introduction*

This case raises a difficult issue on the adequacy of counsel at the state trial in failing properly to explore the falsity of an intellectually-impaired person's confession to killing his niece during a police interrogation using "trickery." For the reasons indicated below the petition for a writ of habeas corpus is granted.

### II. *Procedure*

By memorandum and order of September 10, 2003, *see Singletary v. Fischer*, 227 F.R.D. 209 (E.D.N.Y.2005), this court ruled that other grounds raised in petitioner's request for a writ of habeas corpus were without merit. It simultaneously stayed the federal proceeding to give petitioner an opportunity to exhaust state remedies. Having completed state proceedings, petitioner moved to reopen his federal case and for assignment of counsel. Respondent concedes that state remedies have been exhausted.

The case was reopened. Counsel was appointed. At the request of petitioner's counsel, Dr. Sanford L. Drob, a distin-guished and experienced expert on mental conditions of defendants, conducted psychological tests of the petitioner and issued a full report.

An evidentiary hearing was held in this court at which state trial counsel testified. Petitioner was present by telephone. The court viewed a videotape of the confession of petitioner.

Physical production of the petitioner was ordered at a continuance of the hearing. Petitioner stated for the first time that he had wanted to testify at his trial, but was prevented from doing so by trial counsel.

The report of the expert for the petitioner was received. It indicated that the petitioner had an intelligence quotient of between 60 and 70 when he confessed and when he was tried. Respondent does not contest this finding.

A final evidentiary hearing was held in this court on April 12, 2005, at which petitioner's state counsel was recalled, and the expert for petitioner testified. Petitioner was present in person. The videotape of the confession was played so state trial counsel and petitioner's expert could comment on it.

State trial counsel denied that he had prevented petitioner from testifying at the suppression hearing or trial. He explained that, in accordance with his standard extensive practice, he had advised petitioner not to testify, but had told him that he had a right to testify, and that the choice was petitioner's. Petitioner's habeas corpus counsel has refused the opportunity to amend the petition on this ground. The court credits the testimony of state trial counsel. He also testified that he did not believe, based on his extensive contact with petitioner, that mental impairment explained the confession.

Whether petitioner's failure to describe accurately his relationship with trial coun-

sel was due to a deliberate attempt to mislead this court about his desire to testify; a failure of memory; the suggestion of a jailhouse lawyer; or his misunderstanding of his lawyer, upon whom he relied heavily because he is illiterate, is not decisive. There is often internal pressure on a person accused of a serious crime to gild the evidence of innocence. It is a not-infrequent nightmare of counsel to have a client lie in order—in the client's mind—to appear even more innocent by explaining away adverse evidence. The problem is compounded when the witness is as profoundly unintelligent as is the petitioner.

### III. *Issue*

■ The basic troubling question remains: Did state trial counsel fail to meet minimally constitutionally acceptable standards in failing to adequately attack this mentally retarded petitioner's confession apparently induced by a police officer's lies that he had evidence of petitioner's guilt?

It is a source of some disquiet that even though petitioner has concededly exhausted his state remedies, no state court has had before it the available mental retardation evidence and the scientific agreement that the conditions of petitioner's confession substantially increased the possibility that it was neither voluntary in a constitutional sense, nor even an accurate indication of guilt. This extraordinary procedural catch–22 situation arose because: First, state-appointed trial counsel never had petitioner examined and never made the impairment argument at the suppression hearing or trial. Second, while state-appointed appellate counsel had petitioner examined and was fully aware of the problem, she never brought the matter to the attention of the Appellate Division on the direct appeal; it was matter *de hors* the record, not appropriate at that stage of the proceedings; and she apparently believed that her employer would not authorize her to bring the matter to the attention of the trial court on a collateral 440 attack because she was assigned only for appeals purposes. Third, when this court suggested a 440 motion and stayed federal proceedings, petitioner proceeded *pro se;* he never pressed the matter in the way an adequate counsel would have; and appointment of counsel in state collateral attacks is neither constitutionally required nor the usual practice. When counsel was appointed in this court after exhaustion of state remedies, he fully developed the issue through an expert examination of petitioner, an expert report, testimony of the expert, and briefs on the point.

The inadequacy of the petitioner's 440 motion in state court was properly pointed out by the state Supreme Court Justice ruling on it as follows:

CPL § 440.30(1) requires a motion to vacate a judgment of conviction to contain sworn allegations. CPL § 440.30(4)(b) states that a Court may deny a CPL § 440.10 motion, without a hearing, when an allegation of fact essential to support the motion is made solely by the defendant and is unsupported by any other affidavit or evidence, and under the circumstances, there is no reasonable possibility that it is true.

Defendant's allegation that he is illiterate and has a learning/developmental disability is based on matters which did not appear on the record and were not supported by sworn allegations substantiating or tending to substantiate all essential facts, defendant's motion as to this issue must be denied. The defendant fails to provide the Court with any evidence at all supporting this allegation. Moreover, the fact that defendant may be of substandard intelligence is not determinative since the requisite capacity to knowingly, intelligently and voluntari-

ly waive *Miranda* rights has been found where a defendant is mentally retarded (*People v. Blocker*, 31 A.D.2d 885, 298 N.Y.S.2d 97 (4th Dep't 1969)). Similarly, the confession of a defendant who could not read or write English but was coherent and responsive to questioning was held admissible (*People v. Blocker, supra; People v. Collazo*, 98 Misc.2d 58, 412 N.Y.S.2d 943 (1978)). The suppression court viewed the videotape and was able to determine that defendant knew what he was doing, he knew what his rights were and he wanted to give the statement that he gave. Additionally, [ ] both the videotape and oral statements were coherent and responsive to the questions.

*People v. Singletary*, Indictment No. 12445/97, slip op. at 3–4 (N.Y.Sup.Ct. Dec. 5, 2003). Petitioner's present counsel would have been able to obviate at least some of the state court's problems with the *pro se* 440 application.

This court could now stay the federal proceedings again, and request appointed counsel, acting *pro bono*, to commence another 440 proceeding in state court where the trial record could be expanded. Such a further delay in the proceedings seems unwarranted, particularly because the state courts do not encourage being burdened by repeated 440 proceedings. While not clear, the approach most consonant with Second Circuit and state practice appears to be for this court to now decide the case on the present record without further burdening the state courts. Petitioner has been incarcerated since 1997 and his habeas petition has been pending since 2001. It is time for decision.

As in so many habeas corpus cases, the matter is in that disturbing grey area of doubt where judges can reasonably differ. Were this a capital case, this court would set aside the conviction. Should it do less

in a case where the sentence is so long that petitioner is likely to die of old age in prison?

## IV. *Facts*

### A. *Analysis by Habeas Counsel*

The factual case was put forward forcefully in petitioner's brief, the expert's report and argument in this court relying upon relevant information not presented to the state courts that should have been put forward there. (Quotations are largely from the Report of Dr. Sanford L. Drob, Mar. 15, 2005, slightly modified in punctuation.)

Petitioner was developmentally retarded. Born in South Carolina in 1955, he had been denominated a "non-learner" in that state's public schools and was completely illiterate except that he could sign his name. He had done nothing but menial work, most recently as a "park caretaker" in connection with welfare requirements. He has never been convicted of another crime.

He was convicted of strangling his twenty-five year old niece, Cassandra Ann June, in May of 1995. The penalty imposed was twenty years to life.

Cassandra was his sister's daughter. The victim lived in the same East New York building as petitioner, who shared another apartment with his brother George.

Two years after the homicide in 1997, petitioner reported: "I came home from work-fare. I heard two detectives were looking for me. My aunt said they had left their calling card."

Upon learning that detectives wanted to speak to him he called and made an appointment to go to the precinct house. He asked a woman he knew to accompany him. She told him that she had to do something first. While she went off on

her errand, petitioner sat in the park, drank a Colt 45, smoked marijuana, and then imbibed wine. He says that he drank and smoked because he had time on his hands.

When he arrived at the station house at about 4:00 p.m. the police asked his friend to wait downstairs and told petitioner to go upstairs. A detective asked him, "Do you know why you're here?"

He answered, "[T]o take prints to be cleared for my niece's murder."

The detective responded, "No, you're here because we're holding you as a suspect in your niece's murder."

Petitioner contended that the detective accused him of having "burn marks" on his hand from murdering his niece two years earlier. Petitioner stated, "I don't know what kind of burn marks he was talking about, he never explained it to me." He added, "I kept telling him 'I don't know what you're talking about. I never committed any crime.'" The two of them went back and forth, with the detective telling petitioner that he did it and the petitioner saying he did not.

Petitioner said that the detective told him that he had spoken to his family and that they had stated that petitioner had been using drugs. "He asked me if I could read. I said 'No.' ... He read something off a piece of paper. I was high as a mountain."

Petitioner related, "I don't know what he read, but after he read it he got up and left the room. Before he left the room he had two sheets of paper in his hand. When he returned he had one and he got me to sign it. So how do I know he got me to sign the paper he raed [sic] from or not? It had words on it but I don't know what it was."

"After I signed the paper he went back and returned. He started showing me pictures of Cassandra dead with buize (sic) where somebody strangled her. He asked me if I knew what she had on at the time.... I said it was a dress. I said I never seen the outfit. He said it was a nightgown.... We continued to talk. I kept telling him I didn't do it.... I guess he figured I did it for money, and at a certain time he said that. He told me 'Ain't nobody gonna believe' me."

He recalled that the detective asserted that no one would believe him because he's on welfare and he's black. The detective said "something like," "Who they gonna believe, the white man with the badge or the black man on welfare?"

Then, according to petitioner, the detective "told me if I go his way I could get a 24 month drug program; once I do it I'd go out a free man. But if I didn't do it he could fix it to look like I committed the crime and I could go to jail for a long time."

Petitioner related that the detective did not say how long he could be in jail. According to the petitioner, the detective left the room telling petitioner that he would be back, and in the meantime he was going to call the petitioner's sister, the mother of Cassandra, to ask her to come down to the precinct. Petitioner said that they waited but no one from his family arrived. He speculated, "I think maybe he lied to me and never called."

According to petitioner the detective had told him that when "your sister come down I want you to get on your knees, cry, and tell your sister you killed her by accident and not on purpose." Petitioner said "I kept telling him I didn't do it, but he kept telling me I did."

His sister never came, and the detective said, "We gotta find another way.... I want you to make a tape." When asked by petitioner what this tape was to be

about, he was told, "of me confessing to killing my niece Cassandra." "I said 'No,'" but the detective said "If you don't make the tape you're going to jail."

Petitioner appeared on the videotape. When asked if he killed his niece he said "yes." He was requested to tell why he killed his niece and responded, "I asked her if I could borrow some money and she kept telling me 'no,' and when she went to walk away I grabbed her by the arm, swung her around. I grabbed her by the neck and choked her until she was dead." Petitioner said that earlier he had told the detective he did not know what to say about why he had done it and the detective told him to say that he did it for money. "I made up the idea of finding $25 on top of her TV." He added, "But Cassandra's mother should have known that Cassandra never left money lying around."

The videoed confession was made four to five hours after the earlier interrogation and signed confession. The interrogator was an assistant district attorney. It shows the petitioner crying and wringing his hands, but stating without prompting what he claims he was earlier told to say. Whatever intoxication existed at the time of original questioning appears to have worn off.

In this court when he testified or was present for the testimony of others, petitioner's aspect was dull, his affect flat, and his sense of what was going on appeared minimal. There was no suggestion of prevarication through demeanor.

### B. *Analysis of Expert*

The expert retained after conviction in the state proceedings and again in this habeas proceeding reported to this court in part as follows:

The results of intellectual assessment with Wechsler Adult Intelligence Scale–III (WAIS–III) are indicative of rather severe cognitive deficits. Mr. Singletary obtained a Full Scale IQ score of 63, with a Verbal IQ of 66, and a Performance IQ of 65. In general, the limited score-variability across a variety of cognitive tasks strongly suggests that Mr. Singletary's Full Scale IQ of 63 provides a fair summary of his overall intellectual functioning, and that such functioning is in the deficient range. Mr. Singletary's educational history indicates that his deficits were present during the developmental period.

. . . . .

While both the psychological examination and the videotaped confession shows that Mr. Singletary is intelligent enough to engage in an ordinary conversation, his vocabulary, grammar, and speech pattern is consistent with mild mental retardation or borderline intellectual functioning. His IQ scores, academic and personal history are clearly suggestive of mental retardation. On the videotaped statement, his sentences are simple and his narrative is without many details. In general, the interview is structured by the District Attorney, who asks simple questions, to which Mr. Singletary provides unelaborated responses. Much of what he says is extremely general: e.g. "I was hanging out on the street. I wanted to get high and wanted to get money from her," "She wanted to use her money for what she wanted to use [it] for."

Mr. Singletary is illiterate. He cannot read the words "bed," "ship" or "penny." He describes himself as a "non-learner," as an individual who was in special education classes and who was pushed along to the next grade each year even though he had not mastered the material. While he reports that he did not inform the detective who interviewed him about his learning problems,

the detective certainly would have or should have discovered that he could not read or write. Mr. Singletary reports, however, that he did inform his lawyer that although he had a high school diploma he had been in special classes, was a non-learner and could not read or write.

I have been working as a forensic psychologist for over twenty years—beginning in 1984 on the Bellevue Prison Ward, and approximately 1990 in private practice. Over the years, my experience has been that attorneys who have cases involving a confession refer their illiterate clients and/or those with a history of special education for psychological testing, IQ testing, evaluation of their capacity to make a knowing and voluntary waiver of their Miranda warnings, and issues of suggestibility as they might pertain to the issue of false confessions. My experience with attorneys is that the history provided by Mr. Singletary is typically the basis upon which they request such an examination.

... Based upon my experience his IQ scores are probably lower than the median scores of those individuals who have been referred to me over the years under similar circumstances by defense counsel in state cases (where there is a reported history of learning problems). There is nothing in my examination to suggest that Mr. Singletary was or is lying about his educational history or malingering/exaggerating his cognitive deficits.

Individuals with IQ scores in the range obtained by Mr. Singletary are generally more suggestible, more readily manipulable and more eager to please and comply with authority than those of average intelligence. In addition, studies have indicated that individuals with IQ scores in the mentally retarded and even borderline range, have difficulties understanding the plain meaning of the Miranda warnings, with a very high percentage not understanding the plain meaning of one or more of the warnings. The warnings were read to Mr. Singletary prior to his videotaped statement and, with his head down and hands wringing, he quietly said yes to whether he understood each of the warnings. No effort was made to ascertain what Mr. Singletary understood these warnings to mean.

I should point out that it has long been my clinical observation (as well as that of others in the field) that individual with cognitive deficiencies typically have a great deal of difficulty understanding the Miranda rights and warnings....

Mr. Singletary was obviously quite nervous and distraught at the time of his statement. Such nervousness would have further compromised his capacity to resist suggestion and manipulation on the part of the authorities and would have also further compromised his capacity to perceive, think, and understand his Miranda rights.

Had Mr. Singletary been high on any intoxicants at the time of his interview, as he himself avers, his cognitive function would have likely been furthered compromised.

Report of Dr. Sanford L. Drob, Mar. 15, 2005, at 6–9.

In his testimony—fully credited by this court—petitioner's expert suggested that under similar circumstances where state defense counsel requested his assistance, a finding by the district attorney, jury, or trial court might well have been favorable to petitioner—e.g., suppression of the confession, a finding of not guilty, a finding of guilty of a lesser charge, or a reduced sentence.

The report of the expert was supported by his testimony, excerpted in part below:

THE [EXPERT] WITNESS: ... Individuals with low IQs in the borderline, particularly in the mentally retarded range have what's called an "acquiescence response." They tend to say "yes" to a lot of questions. They tend to look at people who are in authority to provide them with cues as to what decisions they should make. Because they don't trust their own abilities, they tend to be much more readily manipulated by others. They tend to develop at times very trusting attitudes with authority figures because they've had to learn to depend on them to guide them in various arenas of their life throughout their life.

So they are considered to be much more readily suggestible and manipulable than individuals who are of normal intellectual functioning. This is something that has not only been the experience of forensic psychologists over the years but studies by people such as Gooden, Johnson and others beginning in the 1980s established this on an empirical base.

Tr. of Hr'g on Apr. 12, 2005, at 31.

THE WITNESS: ... I don't have an opinion as to whether or not this is a true or false confession in this case, but it is conceivable in an internalized false confession that an individual would present the material as if it was recalled. It is also possible, as I say, that there is, you know, all kinds of shades in between where an individual—he might have had a confrontation with her over something, it was two years before, and now he suddenly gets confused and in the anxiety of the moment, believes, gosh, maybe I did do it, I don't know, and describes something that he recalls and is asked a couple of points that were suggested to him that make him guilty of the homicide.

But I do agree that it doesn't sound like he was just reading from a script.

. . . . .

THE COURT: I certainly cannot say on the evidence before me nor would I think the doctor would say that the defendant is innocent.

THE WITNESS: No. Can't.

THE COURT: ... I don't have an actual innocence case.

MS. BREEN [Counsel for respondent]: Right.

THE COURT: I think we all agree on that.

MR. RHODES [Counsel for petitioner]: I haven't made that claim, Judge.

THE COURT: I know you haven't made it. It is not a DNA case.

THE COURT: .... :

Given the availability of experts of this kind and the availability of information which could be provided to a jury, it is hard to say that this didn't have an impact on the outcome of the case. He was convicted of a fairly high degree of homicide.

MR. RHODES: Murder, depraved indifference murder.

. . . . .

THE WITNESS: [M]y recollection was that I had been consulted on issues like this prior to 1997 and that there was in fact literature in the field on this issue prior to 1997 [i.e., prior to petitioner's 1998 trial].

. . . . .

THE WITNESS: I did a literature review last night, and there is so much on line now, and indeed that is the case, that Johnson in England and Ofshe in California were working on these issues as early as 1983 and that by '97 there was significant literature on this issue, typically with regard to mentally handi-

capped individuals and their suggestibility in the confessions situation.

THE COURT: Now, you've been consulted on a number of cases somewhat like this?

THE WITNESS: I have done false confession cases, yes.

THE COURT: What happens typically where you report to the court or the state or the defendant that it is one of these cases?

THE WITNESS: ... I can't recall a case where I actually got up on the witness stand and said this man is actually innocent, I think this is a false confession. What typically happens is that my evidence is proffered as part of the totality of the evidence or circumstances that the jury or finder of fact would consider in evaluating the reliability of the confession.

Sometimes I am allowed to testify only about my psychological findings, that is, what the IQ was, what the other psychological findings are. Some judges have allowed me to also testify about the literature on the connection between those psychological findings and false confessions and to talk to the jury about the science or the study of false confessions in general.

Some judges have excluded that. Some have permitted it. I can't—I think it has been permitted in federal court, and they tend to exclude it more in the state court but I can't say for sure.

It would be offered as part of the defense's presentation. I don't think that the defense would ask me do I believe this is a false confession, because I don't know. I mean, I am not a lie detector. I am not a finder of fact. THE COURT: And in those cases where you testify, were there any acquittals based on—

THE WITNESS: Yes, yeah. There have been—sometimes to my surprise, there has been acquittals, absolutely.

*Id.* at 46, 47–50.

## V. *Law*

The law on adequacy of representation was explicated in the court's September 10, 2003 memorandum. That document is made a part of this memorandum. *Singletary v. Fischer*, 227 F.R.D. 209 (E.D.N.Y. 2005).

It was the established view of the legal and mental health professions before this case was tried that trickery by the police, particularly when applied to those of immature minds, may cause, with a substantial degree of probability, false confessions. *See, e.g.,* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L.Rev. 414 (1985); Paul T. Hourihan, Note, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L.Rev. 1471 (1995); Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choices and Irrational Action*, 74 Denv. U.L.Rev. 979 (1997); Ronald J. Tabak, *Representing Johnny Lee Gates*, 35 U. Tol. L.Rev. 603 (2004); *see also Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Commonwealth v. DiGiambattista*, 442 Mass. 423, 813 N.E.2d 516, 524–25 (2004); Jim Dwyer, Peter Neufeld & Barry Scheck, Actual Innocence: Five Days to Execution and Other Dispatches from the Wrongly Convicted 90–92 (2000) (providing examples of false confessions, some with retarded defendants).

Criminal interrogators are warned not to do what the police apparently did in the instant case. *See* Fred E. Inbau et al., Criminal Interrogation and Confessions 405 (Jones and Bartlett Publishers, Inc. 4th ed.2004) (2001). The authors of this standard work on the subject caution:

[P]ersons who are unintelligent, uneducated, and come from a low cultural background engage in criminal behavior. The investigator must particularly avoid any theme or interrogation technique designed to persuade such a suspect ... that he is guilty of the offense despite his alleged lack of recall committing it, or statements that threaten inevitable consequences or offer promises of leniency.

*Id.*

In *Mental Retardation, Competency to Waive* Miranda *Rights, and False Confessions,* Professors Solomon M. Fulero and Caroline Everington warn that "confessions are frequently entered by persons with mental retardation in police interrogations without full understanding of their rights," and their statements must be "evaluated closely for reliability." Solomon M. Fulero & Caroline Everington, *Mental Retardation, Competency to Waive* Miranda *Rights, and False Confessions, in* INTERROGATIONS, CONFESSIONS AND ENTRAPMENT 163, 163 (G. Daniel Lassiter, ed., 2004) (citation omitted). The authors remind us,

While there is no work directly finding that persons with mental retardation are more likely to render false confessions than those without mental retardation, all of the evidence ... suggests that this is likely. Persons with mental retardation are susceptible to non-physical forms of coercion, pressure and intimidation by the police that people with normal intelligence can more readily withstand. They are less able to handle the stress and fear of a police interrogation, particularly if the questioning is prolonged. They are also less likely to resist the efforts of an apparently "friendly" police questioner. Their characteristic desire to please figures of authority can lead them to do whatever they think necessary to gain approval.

*Id.* at 171. They point out,

In the British system, when a person with a disability is being interrogated, a neutral person is required in the interrogation to ensure that the individual understands the questions and the implications of any statements that he/she makes.

*Id.* at 176 (citations omitted).

The petitioner, as the literature and the expert testimony indicated, might well have believed that his confession was accurate, his memory having been sufficiently influenced by the situation and his own mental deficiencies. Without expert testimony on the subject there is no way the jury could have appreciated and evaluated the probative force of the confession.

VI. *Application of Law to Facts*

Without the confession there could have been no basis for charging or convicting petitioner. There was no other evidence of guilt. The issue of the effect of trickery in inducing this petitioner's confession floats like a dark cloud above this case. Defense counsel was deficient in failing to bring these matters to the state court's attention in the motion to suppress or at the trial.

 The court has viewed the videotaped confession; read the testimony of the police; heard the post-trial testimony of petitioner, his state trial counsel, and the court-appointed expert; and has observed petitioner in this court. Were this a bench trial before this court it would give little weight to the confession and would be compelled to find the petitioner not guilty. While it can be reasonably argued that petitioner's trial, appeal and state collateral proceedings were fair; his state trial counsel met minimum constitutional standards of representation; his confession

was not coerced in a legal sense; his innocence was a matter for jury resolution; and the writ of habeas corpus should not be granted, this court rejects those conclusions as contrary to the evidence and the law.

The writ should be granted. A three judge panel of the Court of Appeals for the Second Circuit will go over the same ground in exercising its powers of *de novo* review without having observed the witnesses in this court, but with the advantage of seeing the videotaped confession.

## VII. *Conclusion*

The petition is granted on the issues of coercion and adequacy of the state trial attorney in defending petitioner. A certificate of appealability on any other basis is denied for lack of a constitutional ground.

Petitioner's conviction is vacated. He shall be released unless a new trial is commenced within sixty days. This order is stayed until all appellate proceedings are completed.

SO ORDERED.